Roosevelt **WILLIAMS**, Appellant (Defendant Below),

v.

**STATE** of Indiana, Appellee (Plaintiff Below).

No. 49S00–9712–CR–689.

Supreme Court of Indiana.

July 23, 1999.

S. Sargent Visher, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, James D. Dimitri, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

A jury convicted Roosevelt Williams of murder and he was sentenced to sixty-five years imprisonment. In this direct appeal he raises claims, which we restate as: (1) the trial court erred by denying his motion for

mistrial based on the State's failure to disclose an agreement not to prosecute a witness who gave a statement to police and testified against him at trial; (2) the trial court's instructions to the jury on witness credibility and the definition of "reasonable doubt" were erroneous; (3) the trial court erred by admitting the testimony of a DNA expert in the face of the State's nondisclosure of her file; and (4) the trial court erred by excluding the testimony of a defense witness. We affirm the trial court.

### Factual and Procedural Background

Jerome Wade and his stepson Jerry Williams, Jr. ("Jerry," no relation to the defendant) were at their apartment on Staughton Drive in Indianapolis on June 25, 1995. At approximately 2:15 p.m., as Wade stood in the kitchen fixing dinner, Jerry ran to the back of the apartment. Wade turned around and saw two men standing in the doorway holding pistols. One was wearing all blue clothing and had pulled a blue mask over his face. The other was clad entirely in white. The man in blue ran after Jerry, while the man in white told Wade to sit on the couch and repeatedly ordered Wade not to look at him.

Minutes later Wade heard the man in blue say "I know you got it, give it up," then heard several shots fired. When the man in white headed toward the back of the apartment, Wade tried to hide behind a recliner, and the man in white fired several shots at Wade, one of which struck him in the leg. The two intruders then left the apartment. Cynthia Tutt was sitting in her car in front of Wade's apartment building when she saw two men, one of whom had his hand wrapped in a towel, run out of the building, and drive off in a "big cream colored car."

Jerry had been hit by six bullets and died from gunshot wounds to the chest and abdomen. Two 9 millimeter bullets were recovered during the autopsy. When police arrived they discovered a trail of blood leading from the apartment door to the sidewalk outside the building, and also found blood on a small rock across the street from the apartment. Police took several samples from this trail of blood and one sample from the rock.

On the same afternoon at about 2:45 p.m., Williams appeared at Wishard Hospital with gunshot wounds to his arm and his leg. He told a Wishard special deputy that he had been carjacked. Detectives investigating Jerry's murder heard a police radio transmission about a man who had arrived at Wishard Hospital claiming to have been shot in the course of a carjacking that occurred in the general vicinity of the murder. Two days later police obtained and executed a search warrant to draw blood from Williams, who was still at Wishard Hospital. After the blood was drawn, the detectives told Williams that they wanted to talk to him about Jerry's murder. Williams told the detectives that he would like to have some time to think about it, and the detectives told Williams that they would return in about an hour. When they returned, the detectives were unable to locate Williams. Hospital personnel told police that Williams "was not there," but had not been discharged.

DNA analysis of the blood found at the scene compared with samples from Williams, Wade, and Jerry excluded Wade and Jerry, but not Williams, as a source of the blood found at the scene. The DNA profile of Williams, which matched that of the blood found at the crime scene, occurs in one in 22,500 African–Americans.

Almost a year after Jerry's death, Ronald Rush was at his aunt's house when narcotics officers executed a search warrant. Rush was taken to the police station where he was asked if he knew anything about the murder of Jerry Williams. After being told that he was facing twenty to fifty years for a Class A felony drug charge, Rush agreed to talk to the police. According to Rush's statement, Williams and his cousin, Ian Gentry, arrived in Williams' cream-colored Buick to visit Rush. Rush reported that Williams was carrying a 9 millimeter handgun and said he and Gentry were going to rob Jerry. He also displayed a blue mask that he said he would wear to conceal his identity. Rush also told police that he went to Wishard Hospital the following day to speak to Williams, where Williams told him that, although he had planned only to rob Jerry, "it got deeper than just a robbery and he killed Jerry."

Williams also told Rush that Jerry shot him in his arm and in his leg. Williams said that after Jerry shot him he "pulled the nine millimeter out and shot Jerry several times."

At trial, Rush changed his story. He testified that Williams never told him that he had killed Jerry and that his statement to police was based on details he heard from someone else. He also testified that a detective had told him "if I told him what I knew he'd let me go, and I just told him what I heard, you know, because I was scared." Later in the trial, defense counsel asked the detective who took Rush's statement whether Rush received any benefits for giving a statement, and the detective responded that drug charges were not filed. The detective also testified that he had informed a deputy prosecutor in the screening division about this "deal," but had not told the deputy in charge of trying Williams' case. Defense counsel moved for a mistrial based on the State's failure to disclose the arrangement with Rush. In the alternative, Williams asked that the detective's testimony and Rush's testimony be stricken from the record. The trial court denied the motion for mistrial but granted the request to strike the testimony of Rush and admonished the jury that "the testimony and prior statement of Ronald Rush, as well as any testimony concerning them from any other witness are no longer evidence in this case and are stricken from the record."

The jury found Williams guilty of both murder and felony murder. The trial court entered judgment of conviction only for mur-

der and sentenced Williams to sixty-five years imprisonment.

### I. Late Disclosure of the "Deal"

■ Williams contends that the trial court erred by denying his motion for mistrial based on the State's failure to disclose the "deal" made with Rush. It is undisputed that the detective's knowledge of an agreement not to prosecute Rush for a drug charge is imputed to the State. *See Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

■ Williams knew that Rush would be called by the State to testify against him. Rush had given a statement to the police that provided numerous details of the murder and Williams' alleged involvement in it. A copy of this statement was provided to defense counsel months before trial. Defense counsel also deposed Rush before trial and, although that deposition is not part of the record, it is clear from the trial record that defense counsel were aware that Rush had been taken to the police station because of his alleged involvement in a narcotics charge.[1] Defense counsel did not know, however, that there was a "deal" with Rush not to file felony drug charges in exchange for his giving a statement.

■ Because the "deal" became known to Williams and the jury before the trial concluded, there was no *Brady* violation.[2] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct.

1. During argument on the motion for mistrial, defense counsel stated "it was mentioned, I have a dope case, but it—or something like that, and I'd been, I was scared of Det. Humbles, and they were going to throw a dope case on me."

2. We reject the State's reliance on *State v. Nikolaenko*, 687 N.E.2d 581, 583 (Ind.Ct.App.1997), which relied on Seventh Circuit case law in setting forth three requirements that a defendant must prove to establish a *Brady* claim: (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defense; and (3) the suppressed evidence was material. The State argues that it "did not 'suppress' the agreement between it and Rush when Defendant could have easily discovered this agreement during the deposition." *Nikolaenko* dealt with the failure to dis-

close a witness's criminal history or NCIC report, which was eventually obtained through an investigator with the public defender's office. An agreement not to prosecute a witness in exchange for giving a statement to police or testifying at trial is fundamentally different from the a preexisting static piece of evidence such as the NCIC report in *Nikolaenko*. An agreement may be made at various stages of the investigation, or pretrial preparation, or during the course of a trial. It is wholly unreasonable to expect a defendant to conduct repeated, periodic depositions or inquiries to ensure that an agreement has not been made with every witness. Rather, a prosecutor's nondisclosure of a "deal" with a witness is tantamount to its suppression.

1194, 10 L.Ed.2d 215 (1963), and its progeny apply to the State's failure to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment. *Id.* at 87, 83 S.Ct. 1194; *see also Kyles,* 514 U.S. at 432, 115 S.Ct. 1555; *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Brady* applies to evidence impeaching the credibility of State's witnesses. *See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375 (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 'A reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. However, in each of the cases cited, evidence was not made known to the defendant until after the conclusion of the trial. Indeed, the *Bagley* standard assesses materiality in terms of the effect on "the result of the proceeding" or the "the outcome." If the favorable evidence becomes known to the defendant before or during the course of a trial, *Brady* is not implicated. *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392 (*Brady* rule applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense"); *United States v. Kime,* 99 F.3d 870, 882 (8th Cir.1996) (quoting *Nassar v. Sissel,* 792 F.2d 119, 121 (8th Cir.1986)) ("*Brady* does not require pretrial disclosure as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence."); *Braswell v. State,* 550 N.E.2d 1280, 1283 (Ind.1990) ("[I]n the instant case, the discov-

ery of the recorded statement occurred before the trial concluded. Thus appellant's reliance on *Brady* is misplaced.").

▇▇▇▇ In the absence of a *Brady* violation, the State's failure to disclose the "deal" not to file charges against Rush is at most a violation of the trial court's discovery order due to its untimely disclosure.[3] Trial courts are given wide discretionary latitude in discovery matters and their rulings will be given deference on appeal. *Id.* Absent clear error and resulting prejudice, the trial court's determination of violations and sanctions will be affirmed. *Id.* A mistrial is an extreme remedy that should be granted only when nothing else can rectify the situation. *Id.* The trial court's selection of a sanction was not clear error, and Williams has shown no resulting prejudice. The motion for mistrial was properly denied.

## II. Jury Instructions

Williams also argues that the trial court erred in instructing the jury.

### A. Alleged Conflict Between Instructions

▇▇▇ Williams contends that the trial court's instruction that admonished the jury "to deliberate as though you have never heard anything about or from Ronald Rush" conflicted with its general instruction about witness credibility, which included language that the jury "should not disregard the testimony of any witness without a reason and without careful consideration." The latter instruction was the pattern instruction on witness credibility. *See* 1 INDIANA PATTERN JURY INSTRUCTIONS (CRIMINAL) 1.17 (2d ed.1991). Williams asserts that the trial

**3.** As explained in greater detail in *Goodner v. State,* 714 N.E.2d 638, 642–43 (Ind.1999), also decided today, a prosecutor's failure to disclose an agreement not to prosecute a witness in exchange for giving a statement to police or testifying at trial also raises serious concerns under Professional Conduct Rule 3.8(d). Although the Rules of Professional Conduct do not apply to the police, they do apply to all attorneys in the prosecutor's office. Therefore, a prosecutor who learns of an arrangement not to prosecute must take steps to ensure that the affected defendant(s) are informed. Detective Humbles testified that he told Carole Johnson of the screening division

of the Marion County Prosecutor's Office about the deal. However, there is no mention of the deal in the probable cause affidavit, which was signed by both Humbles and Johnson. When asked if he had told the deputy prosecutor who was trying the case about the deal, Humbles responded "[t]he question hadn't come up about that, no." If the facts are as Humbles reported, the Prosecutor's office was obligated to make timely disclosure. In order to discharge that obligation, the office needs to implement procedures to assure that information it holds collectively finds its way to the appropriate trial attorney in a timely manner.

court should have revised the instruction "by inserting additional language that would have again forbidden *any* consideration of Ronald Rush related evidence." However, he did not object to the instruction at trial or make any suggestion that the trial court should alter the language of the instruction on witness credibility. Accordingly, any claim of error based on these instructions is waived. *See Bunch v. State*, 697 N.E.2d 1255, 1257 (Ind.1998) (citing Ind.Crim. Rule 8(B)).

### B. *Definition of Reasonable Doubt*

■ Williams requested the trial court to give the instruction on the definition of reasonable doubt that now appears as Pattern Instruction 1.16. As the comments to that instruction observe, it was criticized in *Winegeart v. State*, 665 N.E.2d 893 (Ind.1996), and an alternative, which now appears as Instruction No. 1.15, was recommended by the majority of this Court. The trial court gave the reasonable doubt instruction that a majority of this Court recommended in *Winegeart*. *See* 1 INDIANA PATTERN JURY INSTRUCTIONS (CRIMINAL) 1.15 (Supp.1997). It was not error to do so.

### III. Objections to DNA Evidence

■ Williams also argues that the trial court erred in allowing the testimony of DNA expert Anita Matthews. His argument on appeal is that "the failure of the prosecution to make timely discovery" handicapped defense counsel's ability to cross-examine Matthews effectively.[4]

Several months before trial, Williams' counsel was provided a copy of a two-page report prepared by Matthews. This report listed the items tested and alleles detected at seven different loci. After speaking to Matthews during the lunch recess of the second day of trial, defense counsel objected to her testimony because

I've come to find out that she has a file that she brought along with her, as well as a calculator that I don't understand, but a file that is approximately two inches thick, an inch and a half thick, filled with materials that would pertain to the testing that was done in the Lab Corp. laboratory in North Carolina. I've seen none of this. . . .

Counsel further expanded on this objection by noting that Matthews did not know much about the database used for the first six alleles and that defense counsel did not know much about the seventh one. The State responded that defense counsel had never asked for the specific information it now sought.

An entry in the Chronological Case Summary at the initial hearing states that the trial court ordered the "parties to comply with Court rules on automatic discovery." There is no court order on discovery in the record. We assume this entry refers to the Rules of Organization and Procedure of the Marion Superior Court, Criminal Division. Rule 7 is captioned "Automatic Discovery" and section 2(a)(4) provides that the State shall disclose "[a]ny reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons." Section 4(a) of that rule further provides that "[u]pon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court, in its discretion, may require disclosure to defense counsel of relevant material and information not covered by this Rule."

■ The State provided Williams with Matthews' two-page report of her conclusions. This satisfied section 2(a)(4) of Rule 7. The additional information sought by Williams and described above falls under sec-

---

**4.** Williams also points to other objections that were lodged to Matthews' testimony at trial but develops no argument to support these objections on appeal. Although Williams' trial counsel legitimately questioned the weight to be given to the testimony, the points raised did not undermine its admissibility. Similarly, Matthews' testimony was admissible under Evidence Rule 702(a) because the subject matter was distinctly related to a scientific field beyond the knowledge

of the average person and Matthews had sufficient skill, knowledge and experience in that area that her opinion would aid the jury. *See Taylor v. State*, 710 N.E.2d 921, 923 (Ind.1999) (citing *Bacher v. State*, 686 N.E.2d 791, 800 (Ind.1997)). Whether she was a population geneticist or merely skilled, experienced, and knowledgeable in the field goes to the weight of the testimony and does not affect its admissibility.

tion 4(a). Williams could have sought this information through discovery, but did not. Rather, he waited until the beginning of trial to ask for material that, in light of the two-page report provided to him, he reasonably knew to exist. The trial court did not abuse its discretion by allowing Matthews to testify.

## IV. Exclusion of Testimony

Williams argues that the trial court erred by excluding the testimony of Brandy White. Defense counsel retained an investigator approximately one week before trial. The investigator spoke to approximately thirty people in his unsuccessful attempt to locate Marcus Holder, the man believed to have driven Williams to Wishard Hospital. White called the investigator at 11:00 p.m. of the second day of trial (Tuesday) and told him that she was with Holder in 1995 when he took a man who had been shot to the hospital. The investigator asked White to meet Williams' attorneys in court the following morning (Wednesday) and she agreed.

Late Wednesday afternoon defense counsel notified the trial court that it would be calling White to testify about Williams' alleged carjacking. White testified as part of Williams' offer to prove that she was riding in a car with Holder when she heard two or three gunshots, saw "two guys jump in a car and take off," and saw Williams lying on the ground along the street. Holder pulled over and Williams stated that he had been shot and his car had been taken. Holder then drove Williams to Wishard Hospital. White testified that she had seen Williams "in the

summer of '95 about three or four times, and I saw him in the beginning part of '96 two or three times," but "that doesn't mean I know him personally." White testified that Williams never mentioned the ride to the hospital to her on these subsequent occasions. White also testified that she did not know Williams' sister "personally, but I've seen her before out. We went out a couple of times." White also testified that her friend Rene Saulsberry told her on Sunday or Monday that an investigator was looking for someone who was with Holder on the day he transported a man who had been shot to Wishard Hospital. White did not call the investigator until late Tuesday night because "I haven't been home. I've been out busy."

■■■ Trial courts have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State. *Cook v. State*, 675 N.E.2d 687, 691 (Ind.1996);[5] *Wiseheart v. State*, 491 N.E.2d 985, 991 (Ind.1986) ("The most extreme sanction of witness exclusion should not be employed unless the defendant's breach has been purposeful or intentional or unless substantial or irreparable prejudice would result to the State."). In light of a defendant's right to compulsory process under the federal and state constitutions, there is a strong presumption to allow the testimony of even late-disclosed witnesses. *See* U.S. CONST. amend. 6; IND. CONST. Art. I, § 13.[6]

■■■ There is no allegation of bad faith on the part of defense counsel. Rather, this issue turns on whether the exclusion of

---

**5.** In a footnote in *Cook,* we observed that five factors may also be helpful in determining whether to exclude witness testimony: (i) when the parties first knew of the witness; (ii) the importance of the witness's testimony; (iii) the prejudice resulting to the opposing party; (iv) the appropriateness of lesser remedies such as continuances; and (v) whether the opposing party would be unduly surprised and prejudiced by the inclusion of the witness's testimony. *Id.* at 687 n. 3 (citing *Woodcox v. State,* 591 N.E.2d 1019, 1026 (Ind.1992)); *see also Wiseheart,* 491 N.E.2d at 991. Applying these five factors lead us to the same conclusion explained in text below.

**6.** Professor Kerr's treatise on criminal procedure correctly summarizes Indiana Supreme Court decisional law as permitting the exclusion of a witness "if either the violation of the discovery requirement was intentional or in bad faith or

the testimony would cause substantial or irreparable prejudice to the opposing party." 16A WILLIAM A. KERR, INDIANA PRACTICE § 16.8, at 538 (1998). However, in light of a defendant's Sixth Amendment right to compulsory process, the federal constitution may permit witness exclusion only when the discovery violation was intentional or in bad faith. *Id.* (citing *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). *Taylor* involved an attorney who acted willfully and blatantly, so the Supreme Court did not have to decide whether exclusion might be an appropriate sanction in the absence of such conduct. According to Professor Kerr, "the Court's strong emphasis on the blatant misconduct as a justification for the preclusion order and its note that Illinois reserves this sanction for cases involving such misconduct may indicate that there is a limitation on the use of the preclusion order." *Id.* at 539–40. We need not address the federal

White's testimony was compelled by a showing of substantial prejudice to the State. The State was informed of White's expected testimony at the end of the penultimate day of trial. It could have interviewed her and investigated at least some details of her story before the conclusion of evidence on the following day. It did not.[7] The trial court gave detailed reasons for the exclusion, observing at the outset that White was "an extremely last minute witness," noting a number of potential areas of inquiry raised by the proffered testimony, and pointing out that one juror's vacation was to start the following day.

■ In short, the trial court's ruling was based on the need for additional time for the State to investigate White and the details of her story, and a scheduling conflict with a juror's planned vacation. Neither rises to the level of substantial prejudice to the State under the facts of this case. The State was given an evening to begin, if not complete, an inquiry about White and her story. If additional time was needed, a continuance would plainly have been appropriate. *See Cook*, 675 N.E.2d at 691 (observing that generally a continuance, rather than exclusion, is the appropriate remedy for the late disclosure of a witness). However, a continuance was not sought.[8] Moreover, the Chronological Case Summary states that an alternative juror was selected, and there is no suggestion that he could not have replaced the juror whose continued service would have conflicted with her vacation plans in the event that a continuance was granted. Under these circumstances it appears that the trial court should have allowed White to testify, either on the final day of trial or after giving the State a brief continuance to investigate her and the details of her story. The "most extreme sanction,"

*see Wiseheart*, 491 N.E.2d at 991, of witness exclusion was an abuse of discretion under the facts described above.

■ Nevertheless, we will find an error in the exclusion of evidence harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights. *Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995). Cynthia Tutt testified that she saw two men running from the scene of the crime, one with his hand wrapped in a towel. The blood trail discovered by police demonstrates that one of the men was bleeding. Williams appeared at Wishard Hospital with two gunshot wounds within thirty minutes of the crime. DNA analysis of the blood trail found at the crime scene excluded Jerry and Wade, but not Williams, as the source. The DNA profile of Williams, which matched that at the crime scene, occurs in one in 22,500 African–Americans.

■ Although it is obvious that the trial court had severe reservations about White's credibility, this was an issue for the jury. Nonetheless, White's testimony is unlikely to have weighed appreciably in Williams' favor in light of the DNA and other evidence that connected him to the crime. Accordingly, we conclude that the exclusion of her testimony was harmless error.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

constitutional issue, however, because even under the *Cook* rule the defendant has demonstrated trial court error.

7. Before ruling on exclusion, the trial court asked the State if it had "develop[ed] anything" with respect to White. The State responded that its investigators had left for the day by the time the hearing on White's testimony had concluded. However, the deputy prosecutor did talk to some of the State's witnesses who told him that they had seen White talking to individuals he believed to be Williams' sister and a friend of Williams', which suggested to him "that there is more than

just a casual connection between [White] and these other people. . . ."

8. The State also had the option of allowing White to testify without the benefit of a continuance to investigate her, then cross-examining her vigorously about her association with the defendant and his sister, her last-minute decision to come forward, and the other problematic areas of her testimony. However, the State sought and secured exclusion instead. In so doing, it assumed the risk of reversal in the event that the trial court's ruling was found improper on appeal.