## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 22 2016, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Edgar
J. Edgar Law Offices, Prof. Corp.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brandon Lewis,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | July 22, 2016<br><br>Court of Appeals Case No.<br>49A02-1509-CR-1395<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Grant W. Hawkins, Judge<br><br>Trial Court Cause No.<br>49G05-1505-F1-15583 |

**Najam, Judge.**

# Statement of the Case

[1] Brandon Lewis appeals his convictions for rape, as a Level 1 felony; criminal confinement, as a Level 3 felony; battery, as a Level 5 felony; criminal mischief, as a Class B misdemeanor; and his adjudication as a habitual offender following a jury trial. Lewis presents the following issues for our review:

1. Whether the trial court abused its discretion when it excluded certain defense witnesses from trial.

2. Whether the State presented sufficient evidence to support his convictions.

We affirm in part, reverse in part, and remand with instructions.

# Facts and Procedural History

[2] In the recent past, Lewis and H.D. became acquainted after Lewis fathered children with H.D.'s sister. Lewis and his girlfriend lived with H.D. and H.D.'s children for a period of time in 2014, and Lewis and H.D. had a sexual relationship for a period of time. On April 18, 2015, Lewis, H.D., and H.D.'s two minor children went out to dinner together and then to a friend's house for a party. Lewis had spent the night with H.D. the night prior, and they may have had consensual sexual intercourse at that time. The night of the party, however, H.D. became annoyed with Lewis, and H.D. and her children left the party without him. H.D. told Lewis not to come back to her house that night. H.D. and her children went home and went to sleep.

[3]     At some point in the night, H.D., who had been sleeping in an upstairs bedroom at her duplex, "heard banging" downstairs and "heard the blinds" move in a window downstairs. Tr. at 64. H.D. called 9-1-1 to report that someone was breaking into her house. While she was on the phone, she saw Lewis walking up the stairs. H.D. walked downstairs past him and opened the door to wait for the police to arrive. In the meantime, Lewis followed H.D. and told her that she should not have called the police. Lewis took a gun out of his pocket and showed it to her. As he took the gun out, he said that "he would get locked up for a long time" and that "he would do anything that he had to against anybody" to avoid jail. *Id.* at 68.

[4]     When officers with the Indianapolis Metropolitan Police Department ("IMPD") arrived, they began to question Lewis, who told them to talk to H.D. The officers then asked H.D., who was standing approximately six feet away from Lewis during the questioning, whether she "needed them," and she responded in the negative. *Id.* at 70. H.D. did not tell the officers that she wanted Lewis to leave. After the officers left, Lewis was "in and out of the house," and then Lewis and H.D. began to argue. *Id.* at 108. At some point, Lewis threw H.D.'s phone against a wall, and it broke. While in an upstairs bathroom, Lewis pushed H.D., and they started fighting. H.D. yelled out of the open bathroom window, and Lewis closed the window. Lewis hit H.D. in the face, and, at some point, H.D. lost consciousness for a brief time. When H.D. regained consciousness, Lewis dragged her from the bathroom to her bedroom.

[5]     Once in the bedroom, Lewis told H.D. to take off her pants, but she refused. While Lewis pulled off her pants, she struggled with him in an effort to stop him. After her pants were off, Lewis "ripped" off her underwear. *Id.* at 81. Lewis then picked H.D. up and put her on the bed. Lewis told H.D. to turn over, which she initially refused to do, but then she turned over. Lewis started having sexual intercourse with H.D., and she told him to stop. Lewis continued having sexual intercourse with H.D., and she alternatively told him to stop and told him that he could proceed. Finally, Lewis asked H.D. whether he could "finish," and she said yes. *Id.* at 126.

[6]     Afterwards, one of H.D.'s children came into her bedroom and asked for something to drink. Lewis went downstairs and returned with a drink, and H.D. told him to leave. Lewis got angry and told H.D. that he was taking his washing machine and dryer with him. When he was unable to unhook the washing machine, he "just pulled it out of the wall." *Id.* at 87. Lewis then called his girlfriend, and H.D. went upstairs and went to sleep.

[7]     The next evening,[1] H.D. went to a nearby hospital and reported that she had been beaten and raped, but she did not contact the police. Amanda Via-Smith, the physician's assistant treating H.D. at the hospital, observed bruises and abrasions on H.D.'s body consistent with H.D.'s description of events the night before. Via-Smith offered H.D. a consultation with a forensic nurse, and H.D.

---

[1] The incident occurred on Saturday night or early Sunday morning, and H.D. went to the hospital that Sunday evening.

agreed. However, a forensic nurse was not available that evening, and Via-Smith instructed H.D. to return to the hospital at a later date to see the forensic nurse. On April 21, H.D. returned to the hospital, and a forensic nurse conducted a rape kit examination. H.D. told the forensic nurse that Lewis had beaten and raped her, and the nurse also observed injuries consistent with H.D.'s narrative. After leaving the hospital, H.D. and her children moved to the Julian Center. While at the Julian Center, H.D. stayed in touch with Lewis, and he visited H.D. and the children on two occasions.

[8]     On May 3, H.D. returned to her home and saw that it had been burglarized. H.D. called 9-1-1. When officers arrived, a friend of H.D.'s named Cody was also there, and Cody told the officers that, a few weeks prior, H.D. had told Cody that Lewis had raped H.D. While the officers were talking about the rape with H.D., Lewis arrived at H.D.'s house. After recovering H.D.'s ripped underwear from her bedroom and taking photographs of H.D.'s home, the officers arrested Lewis.

[9]     The State charged Lewis with rape, as a Level 1 felony; burglary, as a Level 2 felony; criminal confinement, as a Level 3 felony; battery, as a Level 5 felony; and criminal mischief, as a Class B misdemeanor. The State also charged Lewis with being a habitual offender. Following a bench trial, the trial court found Lewis guilty on all counts except for the burglary count, and the court adjudicated him to be a habitual offender. The trial court entered judgment accordingly and sentenced Lewis to an aggregate executed term of forty-three years. This appeal ensued.

# Discussion and Decision

## *Issue One: Defense Witnesses*

[10] Lewis contends that the trial court abused its discretion when it excluded three proffered defense witnesses from testifying at trial. In particular, after the final pre-trial hearing, Lewis added the following people to his witness list for the July 13 trial: Kelly Abel-Raymond (June 11); Kiva Culbertson (June 26); and Suprena Carter (July 8). In its motion to exclude those witnesses, the State alleged that Abel-Raymond had twice failed to appear for scheduled depositions; Culbertson had not appeared for a scheduled deposition; and the State had been unable to schedule Carter for a deposition given the short notice.

[11] Trial courts have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State. *Williams v. State*, 714 N.E.2d 644, 652 (Ind. 1999). In light of a defendant's right to compulsory process under the federal and state constitutions, there is a strong presumption to allow the testimony of even late-disclosed witnesses. *See* U.S. Const. amend. 6; Ind. Const. Art. 1, § 13.

[12] Initially, as the State correctly points out, Lewis did not make an offer of proof with respect to Abel-Raymond's proposed testimony. As such, Lewis' objection to the exclusion of Abel-Raymond's testimony was not preserved on appeal, and the issue is waived. *Wiseheart v. State*, 491 N.E.2d 985, 991 (Ind. 1986) (holding that when a defendant does not make an offer of proof, he has

not adequately preserved the exclusion of witness' testimony as an issue for appellate review).

[13] With respect to the late notice that Culbertson and Carter were to testify on Lewis' behalf at trial, the State alleged bad faith and substantial prejudice. However, the State did not move for a continuance, which generally is the "appropriate remedy in this situation."[2] *Cook v. State*, 675 N.E.2d 687, 691 (Ind. 1996). Regardless, a trial court's exclusion of a witness' testimony is subject to a harmless error analysis. We will find an error in the exclusion of evidence harmless if its probable impact on the factfinder, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights. *Williams*, 714 N.E.2d at 652.

[14] In his offer of proof, defense counsel stated that Culbertson, Lewis' girlfriend, would have testified that

> [Culbertson] had given some money to [Lewis] to give to [H.D.] to pay off possibly some drug dealers, which *could explain* why there was a burglary at [H.D.'s] house, or breaking in. Because [H.D.] was afraid of drug dealers. It also explains why [H.D.] alleged a rape so she could go to the Julian Center to get away from her home when the drug dealers were looking for her.

---

[2] The State did not ask for a continuance either in its written motion to exclude witnesses or in open court at the beginning of trial. While Lewis' defense counsel stated that he was not amenable to a continuance, the State had not requested one. And, as of the day of trial, there were three days left before the deadline for a speedy trial pursuant to Lewis' request.

Tr. at 7 (emphasis added). When pressed by the trial court, defense counsel admitted that the only "admissible testimony" was that Culbertson gave Lewis "some money to pay for drugs," and he also admitted that the evidence was "tenuous at best." *Id.* As the proffered testimony was not relevant to H.D.'s allegations of criminal confinement or rape or was otherwise pure speculation,[3] we hold that any error in the exclusion of Culbertson's testimony was harmless.

[15] In his offer of proof regarding Carter's proposed testimony, defense counsel engaged in the following colloquy with the trial court:

> Defense Counsel: I think the main thing she would say is, this all started at a party on Oakland Street. [Carter] was at that party. She witnessed drug use and alcohol consumption by the alleged victim. She's also aware of a fight between the alleged victim and a woman named Megan that happened the day after these allegations, which would explain how [H.D.], the alleged victim, received bruises, and so she would testify in regard to that.
>
> Court: She saw the fight?
>
> Defense Counsel: I don't think she saw the fight. But she— Megan, who is the woman who was in a fight with [H.D.] told her about the fight.
>
> Court: So it would be arguably inadmissible?

---

[3] To the extent the proffered testimony would have impacted H.D.'s credibility, the trial court heard evidence that H.D. had previously been convicted of theft, and she had admitted to smoking marijuana the night of the rape.

> Defense Counsel: And yes I suppose it would be admissible as impeachment if I ask [H.D.] about the fight and she denies it.

*Id.* at 4-5. First, at trial, H.D. admitted to drinking alcohol and smoking marijuana at the party the night of the rape, so that part of Carter's proffered testimony would have been cumulative. Second, to the extent Lewis would have used Carter's testimony about the alleged fight between H.D. and Megan to impeach H.D.,[4] Lewis has not persuaded us that the probable impact of that testimony on the factfinder, in light of all of the evidence in the case, affected his substantial rights. Any error in the exclusion of Carter's testimony was harmless.

### Issue Two: Sufficiency of the Evidence

[16] In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses. *Sharp v. State*, 42 N.E.3d 512, 516 (Ind. 2015). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the judgment, and we will affirm the convictions if there is probative evidence from which a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.*

---

[4] If offered to prove the truth of the matter asserted rather than as impeachment evidence, that testimony would have been inadmissible hearsay.

[17] Lewis first contends that the State presented insufficient evidence to support his convictions because H.D.'s testimony was incredibly dubious. The incredible dubiosity rule, which is only applied in limited circumstances, allows a court to impinge upon the factfinder's duty to judge witness credibility where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a *complete lack of circumstantial evidence* of the appellant's guilt. *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015). "'The testimony must be so convoluted and/or contrary to human experience that no reasonable person could believe it.'" *Id.* at 756 (citing *Campbell v. State*, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000)).

[18] Lewis asserts that H.D.'s testimony was inherently inconsistent and equivocal,[5] and he maintains that she had a motive to lie, "felt coerced," and recanted her

---

[5] H.D.'s testimony regarding whether she had consented to sexual intercourse with Lewis at the time of the alleged rape was equivocal, as she testified that she alternately consented and withdrew her consent throughout the incident. But IMPD Detective Laura Smith testified as follows with regard to H.D.'s testimony:

> Q: . . . [B]ased on your training and your experience being a sex crimes detective is it uncommon for victims who are in a relationship with a person who raped them to be reluctant to testify?
> A: No, I would say that is common.
> Q: Okay. And is it uncommon for victims who are in a relationship with a person who raped them to minimize what happened to them later?
> A: I'd say that's pretty common.
> Q: Okay. And what are the reasons why a person who is a victim of such a rape, why would they do that?
> A: Sometimes they worry a lot about like throwing a rock in a pond and watching it splash. Sometimes they have children in common, sometimes they have family dynamics, sometimes they feel threatened by others who they know in common. They feel—strangely they feel guilty afterwards like they are going to hurt them. That's just the way the body heals. And when you have a personal relationship with someone and you care about them I think it's difficult to turn that off and so it's common for them to minimize.

testimony after the trial.[6]  Appellant's Br. at 19.  Thus, Lewis contends that H.D.'s testimony was incredibly dubious.  But it is well settled that the incredible dubiosity rule only applies where there is a *complete lack* of circumstantial evidence.  *See id.*  And here, as Lewis acknowledges, there was circumstantial evidence to corroborate H.D.'s testimony.

[19]  Lewis asserts, however, that "the circumstantial evidence originates solely from [H.D.] and is just as unreliable as her testimony."  Appellant's Br. at 24.  And Lewis asks that we create an exception to the rule under such circumstances.  We decline Lewis' invitation.  H.D. testified that Lewis dragged her down a hallway, beat her, knocked her unconscious, ripped off her underwear, and raped her.  H.D. reported the rape and assault to Via-Smith the next day, and H.D. underwent medical examinations that revealed injuries consistent with the events described by H.D.  In addition, officers found H.D.'s ripped underwear in her bedroom.  Because the circumstantial evidence corroborates H.D.'s testimony in this respect, the incredible dubiosity rule does not apply here.  *Moore*, 27 N.E.3d at 755.  H.D.'s testimony and circumstantial evidence was sufficient to support Lewis' convictions.

---

Tr. at 227-28.

[6]  H.D. sent a notarized letter to Lewis' counsel wherein she recanted her trial testimony, but, as the State observes, that letter was sent the same day that Lewis violated a no-contact order and spoke with H.D. by telephone.  And Lewis does not present cogent argument to explain the letter's relevance to his contention that H.D.'s trial testimony was incredibly dubious.

[20]    Finally, Lewis contends that the State presented insufficient evidence to prove that he was armed with a deadly weapon during the rape and criminal confinement of H.D. Lewis maintains that, without such evidence, those convictions must be reduced from Level 1 and Level 3 felonies to Level 3 and Level 6 felonies, respectively. We must agree.

[21]    To support the enhancement of both the rape and criminal confinement convictions as charged, the State was required to prove that Lewis committed those offenses while armed with a deadly weapon, namely, a gun. Ind. Code §§ 35-42-4-1(b), 35-42-3-3(a)(2)(A) (2014). Possession of a gun can be either actual or constructive. *See Henderson v. State*, 715 N.E.2d 833, 835 (Ind. 1999). Actual possession occurs when a person has direct physical control over the item. *Id.* Constructive possession occurs when somebody has the intent and capability to maintain dominion and control over the item. *Id.*

[22]    As the State correctly contends, when a rape conviction is elevated due to the use of a deadly weapon, it is not necessary for the State to show that the weapon was held on the victim at all times. *Potter v. State*, 684 N.E.2d 1127, 1137 (Ind. 1997). In reviewing a sufficiency of the evidence claim concerning whether a defendant was armed with a deadly weapon, this court looks to such factors as whether there was an initial show of deadly force with the weapon, whether the intent was to intimidate the victim with the weapon, and whether

the weapon was at least constructively under defendant's control at all times. *Id.*

[23] On appeal, Lewis maintains that, while the evidence showed that he was armed with a gun prior to the criminal confinement and rape, there was no evidence or inferences therefrom to show either actual or constructive possession of a gun during the commission of those offenses. Indeed, H.D. testified that "the last time [she] saw the gun was before the police got there," and she testified that Lewis was "in and out" of the house between the time the police officers were there and the criminal confinement and rape occurred. Tr. at 108. There is no evidence that H.D. felt threatened by Lewis' possession of a gun during the criminal confinement or rape. H.D. testified only that, when Lewis initially displayed the gun to her while they were waiting for the police officers to arrive, she understood that "[he] would do anything that he would have to not to get locked up." *Id.* at 68.

[24] And, notably, at the conclusion of trial, the trial court stated in relevant part as follows:

> I'm satisfied that a rape occurred. The challenge on appeal will be determining—we need better language and more clear language on what armed rape is. There is no doubt that [H.D.] knew the defendant routinely carried a gun. She saw it earlier that evening/morning. *But there was no testimony that she saw it after the police arrived*, for example. So we need that discussion.

*Id.* at 270 (emphasis added).

[25] Lewis and H.D. were downstairs in her house, waiting for the police officers to arrive, when Lewis showed her a gun. After the officers left, Lewis was in and out of the house for a period of time. Later, when Lewis and H.D. were in an upstairs bathroom, Lewis physically assaulted H.D., dragged her down the hallway to a bedroom, and raped her. At no time during those events, which took place upstairs in H.D.'s house, did H.D. see a gun.[7] Thus, while the evidence shows an initial show of force by Lewis with the gun and intimidation of H.D. with respect to her 9-1-1 call, given Lewis' movements in and out of the house after that and the remoteness in time and location of the crimes from that initial show of force, the evidence does not support that Lewis constructively possessed a gun during the criminal confinement and rape. *See Potter*, 684 N.E.2d at 1137. We hold that, under these circumstances, the evidence is insufficient to prove that Lewis committed the criminal confinement or rape while armed with a deadly weapon. We remand and instruct the trial court to vacate Lewis' convictions for rape, as a Level 1 felony, and criminal confinement, as a Level 3 felony, and enter convictions for rape, as a Level 3 felony, and criminal confinement, as a Level 6 felony, and resentence Lewis accordingly.

[26] Affirmed in part, reversed in part, and remanded with instructions.

---

[7] On redirect examination, the prosecutor asked H.D. whether she remembered "telling Detective Smith that [she] saw [Lewis] pick the gun up from between the nightstand." Tr. at 123. But H.D. responded, "No." *Id.* And the State did not present any evidence the H.D. had told Detective Smith or anyone else that she had seen a gun in the course of either the criminal confinement or the rape.

Robb, J., and Crone, J., concur.