# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**DARREN BEDWELL**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHRISTOPHER M. MONTGOMERY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1312-CR-1039 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice, Jr., Judge
Cause No. 49G05-0704-MR-55165

**November 21, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Pursuant to an order from the post-conviction court, Judge Grant W. Hawkins presiding, Christopher Montgomery filed this "new direct appeal on his convictions for Count I, Murder, and Count III, Neglect of a Dependent," which the post-conviction court "limited to issues related to the introduction of 404(b) evidence and sufficiency consistent with [the] court's findings." Appellant's Appendix at 443. We first address an issue *sua sponte*, which is whether the post-conviction court erred when, following a determination that Montgomery received ineffective assistance of appellate counsel, it ordered that Montgomery be granted a second direct appeal. Following this discussion, we address the two issues raised by Montgomery, which we revise and restate as:

I.      Whether the trial court abused its discretion by excluding certain evidence; and

II.     Whether his conviction of neglect of a dependent as a class B felony violates double jeopardy principles.

We affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL HISTORY

The relevant facts as discussed in Montgomery's initial direct appeal follow:

[I]n March 2007, Montgomery lived in a hotel with his long-time girlfriend, Courtney, and her children, Casey, and four-year-old Elijah Simpson. At approximately 7:00 p.m. on March 29, Courtney went to work while Montgomery stayed in the room to babysit the children. At some point during the evening, Montgomery became angry when Elijah sucked his thumb, ordered him to stop, and then ordered the child to stand in the corner. He remained there for hours until Montgomery ordered the boys to bed around 11:00 p.m. Whenever Elijah began sucking his thumb as he slept, Montgomery would awaken him and order him to stop. Courtney arrived home from work at about 2:00 a.m. and went to bed, while Montgomery remained awake playing video games. At about 5:00 a.m., Courtney awakened to hear Montgomery say to Elijah in a "loud", "aggressive" tone, "Get up little n----, go—get your ass in the corner." *Transcript* at 132. Elijah obeyed and stood in the corner. After he had

2

been standing there for approximately two hours, Courtney heard Montgomery say in an aggressive voice, "come here . . . stand by the bed." Id. at 134. Elijah turned and looked at Montgomery "like he was scared", but did not move toward the bed. Id. at 135. This angered Montgomery, who walked to Elijah, grabbed him by one arm and one leg, raised him to about the level of his (Montgomery's) head, and then threw him to the floor. Elijah cried out and then immediately began having a seizure. Courtney picked Elijah up and told Montgomery they needed to take the child to the hospital. Montgomery responded,

> I don't know how you [sic] getting there, you [sic] not taking my car. And if you call the police, or the ambulance, or your family, then you gonna be dead before they get here. So you pick one. Make a choice. . . . You better act like you understand. You here [sic] me talking to you?

*Id.* at 138. Courtney noted that Elijah's seizure had subsided by that point and therefore thought he would be "okay". *Id.* She laid down and went back to sleep. When she woke up sometime later, Elijah was not breathing. She told Montgomery they needed to take Elijah to the hospital. Montgomery panicked, saying, "Oh, not my little n----. I don't want to go to the jail." *Id.* at 140. They drove Elijah to the hospital and during the drive, Montgomery instructed Courtney not to tell anyone what had happened. Efforts undertaken at the hospital to save the child's life proved unsuccessful and Elijah was pronounced dead. Police were summoned and started an investigation.

When questioned at the hospital, Courtney provided few details about what had happened, saying only that Elijah had suffered a seizure. Police drove to the motel and questioned Montgomery. He claimed he had left the motel that morning around 8:00 to buy new tires, and when he returned he found Elijah dead in his mother's arms.

An autopsy was performed upon Elijah's body the next morning, and it was discovered that Elijah had a fresh, four-inch fracture of the occipital bone on the back of his skull. This fracture had caused a thick subdural hematoma. Moreover, Elijah's brain had been shaken from one side to the other in his skull with sufficient force to cause contusions on both sides of his temporal lobes. A medical doctor stated that the force necessary to cause such an injury would have been "major", and the equivalent of a car crash. *Id.* at 284. Police again interviewed Courtney, and this time she related the events resulting in Elijah's death, as detailed above.

3

Montgomery v. State, No. 49A02-0804-CR-343, slip op. at 2-4 (Ind. Ct. App. Dec. 2, 2008), trans. denied.

On March 31, 2007, Detective Bill Rogers and Detective Kennedy interviewed Montgomery regarding Elijah's death in which Montgomery initially denied any wrong doing. Later in the interview, Montgomery began talking about the date in question and stated that "he had noticed that Elijah was sucking his thumb and had continued to do so after he had told him not to, and that he had placed Elijah face first into a corner for upwards of four hours." Transcript at 219. Montgomery stated that between 2:00 and 3:00 a.m., after putting Elijah to bed he noticed that Elijah continued to suck his thumb even in his sleep, and he "continually woke Elijah to pull his thumb out of his mouth and to scold him . . . ." Id. at 220. He stated that Courtney was home when this occurred.

He told the Detectives that Elijah continued to suck his thumb, which angered him, that he woke Elijah and placed him face first in a corner for about an hour to an hour and a half, and that Elijah became "fidgety" and he called Elijah to his bed. Id. at 221. Montgomery stated that Elijah did not move as quickly as he would have liked, and when Elijah did finally come he "frogged" Elijah twice in the chest. Id. Montgomery stated that afterward, he "picked Elijah up and dropped him." Id. at 222. Montgomery first indicated that he dropped Elijah from a height of "just above his knees," but after Detective Kennedy told him that the injuries did not match what Montgomery was describing, Montgomery gave two other explanations in which both the height and the manner in which Elijah was thrown were changed. Id. In Montgomery's second explanation, he demonstrated that he held Elijah from a "mid torso" height and let go, but

4

in his third explanation he demonstrated that he picked Elijah up to "his head level and tossed." Id. at 225.

On April 5, 2007, the State charged Montgomery with, among other counts, murder, two counts of neglect of a dependent as class A felonies, and neglect of a dependent as a class C felony.[1]  On February 20, 2008, Montgomery filed, as amended, a Notice to the Court of Intent to use 404(b) Evidence regarding evidence of a pattern of abuse engaged in by Elijah's mother, Courtney, against Elijah, which he stated was "relevant and admissible as evidence of [her] guilt, motive, identity, bias and interest." Appellant's Appendix at 226.  That same day, the trial court, Judge Robert R. Altice presiding, held a hearing on the issue and ultimately ruled that although some of the evidence was admissible, including evidence that Courtney had battered Elijah a week prior to his death and that Elijah had a cut/bruise on his forehead at the time of his death, it also ruled that most of the proffered evidence was not admissible based on Ind. Evidence Rules 401, 403, 404(b), and 801.  The trial court also noted at the end of the hearing that its rulings were preliminary and subject to change as the evidence was admitted at trial.

On February 25, 2008, the court commenced a jury trial, and on February 26, 2008, the jury found Montgomery guilty as charged.  The court entered judgment of conviction on the murder count and set a sentencing hearing date.  On March 12, 2008, the court held a sentencing hearing and entered judgment of conviction on two counts of

---

[1] Initial charges including two additional counts of neglect of a dependent as class A felonies, as well as counts of criminal confinement as a class C felony and dealing in marijuana as a class D felony, were ultimately dismissed.  In addition, Montgomery was charged with unlawful possession of a firearm by a serious violent felon as a class B felony and possession of marijuana as a class D felony, but each of those charges were severed on Montgomery's motion.

5

neglect of a dependent, including under Count III for failing to seek immediate medical help after Elijah sustained his head injury, and under Count VI as a class C felony for making Elijah stand in the corner in the middle of the night. Montgomery, slip op. at 4. The court reduced the conviction under Count III to a class B felony based upon double jeopardy concerns. The court sentenced him to fifty-five years for murder, which was to run concurrent with a four-year sentence on Count VI. Id. On Count III, the court sentenced Montgomery to ten years to be served consecutive to the other counts. Appellant's Appendix at 44-45. Thus, Montgomery was sentenced to an aggregate term of sixty-five years.[2]

Montgomery brought a direct appeal challenging the sufficiency of the evidence of both the murder and the class C felony neglect of a dependent convictions, and on December 2, 2008, this court affirmed his murder conviction and reversed the class C felony neglect of a dependent conviction. Montgomery, slip op. at 1, 9. His aggregate sentence remained unchanged, however.

Montgomery filed a petition for post-conviction relief, and the post-conviction court held hearings on his petition on September 19, 2012, and October 31, 2012. On October 12, 2013, the post-conviction court issued its "Findings of Fact and Conclusions of Law Denying Post-Conviction Relief" (the "Post-Conviction Order") in which it granted in part and denied in part the relief sought by Montgomery. Appellant's Appendix at 417. The Post-Conviction Order stated in relevant part:

---

[2] Montgomery subsequently pled guilty to possession of a firearm by a serious violent felon and was sentenced to six years to be served concurrent with the murder conviction.

6

# CONCLUSIONS OF LAW

\* \* \* \* \*

**1(b).** **404 (b) Evidence–Appellate counsel** Turning now to appellate counsel, the court does believe that there was both deficient performance and prejudice as it relates to the presentation of the 404(b) claim. This court first notes that included in the transcript provided to appellate counsel was a 40 page transcription of the 404(b) hearing conducted in this matter only 3 weeks prior to trial. In addition, on the day of trial, trial counsel renewed her objections to the court's 404(b) rulings and offered up new case law . . . . Additionally, the Appellants [sic] Appendix contained defendant's lengthy Notice of Intent to Use 404(b) Evidence (sighting [sic] appropriate case law) as well as the State's Brief in rebuttal . . . . Finally, trial counsel included as the first potential issue of appeal in her pre-appeal form, what she believed to be the court's erroneous rulings as to the 404(b) evidence ultimately denying them a right to present a defense. In spite of all these references, appellate counsel chose not to address this issue.

\* \* \* \* \*

. . . . Taken as a whole, it is well within the Court of Appeal's [sic] discretion and likely probable that they would rule some or all of the 404(b) evidence admissible in this case.

. . . . The court finds given the extensive arguments, briefs and reference to 404(b) that this issue was significant and obvious from the face of the record. . . . Although quite technically appellate counsel in this case succeeded on a sufficiency claim as it related to [the neglect of a dependent as a class C felony conviction], the court believes that as to this claim only, sufficiency was the best course of action. As to Count I, Murder, however, a sufficiency claim was clearly 'insufficient,' and defendant was prejudiced by the deficient performance in failing to raise this significant and obvious claim.

\* \* \* \* \*

## 3. **Overall Performance.**

As this claim relates to trial counsel, this court finds that the overall performance of trial counsel was effective and in many instances superior. However, the issue of waiver of the 404(B) [sic] issue is vexing. As this

claim relates to appellate counsel, this court finds that the overall performance of appellate counsel was ineffective.

As noted in the findings of fact, this court finds that the preparation and execution of the appellate brief in this case was deficient. As to the two arguments presented (over the course of 3 pages), the first argument successfully challenged the sufficiency of the evidence on the conviction for class C felony neglect of a dependent. Montgomery received a concurrent four (4) year sentence on that count. Appellate counsel's success in getting the conviction and sentence vacated on that count did not affect the aggregate sentence of 65 years. As to the one paragraph argument challenging the sufficiency of the murder conviction, appellate counsel did not cite any cases. Appellate counsel raised no evidentiary issues on appeal although there were two that were suggested and obvious from the record: 1) use of the crash test dummy; and 2) exclusion of 404(b) evidence. This court notes the latter as being the most appropriate and with a probability of success.

The overall performance of appellate counsel was deficient and prejudiced the defendant.

## **Judgment**

The law as it relates to the ineffective assistance of trial counsel is with the State and against [Montgomery].

The law as it relates to the ineffective assistance of appellate counsel is with [Montgomery] and against the State.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Petition for Post-Conviction Relief is hereby GRANTED in part and DENIED in part. Having found that appellate counsel was ineffective, this court orders that Montgomery be given a new direct appeal on his convictions for Count I, Murder, and Count III, Neglect of a Dependent. The issues on appeal are limited to issues related to the introduction of 404(b) evidence and sufficiency consistent with this court's findings. The appellate division of the Marion County Public Defender's Office is directed to file a Notice of Appeal within 30 days.

Id. at 436-438, 442-443.

On October 22, 2013, Montgomery filed his notice of appeal under Cause No.

49A02-1310-PC-884 ("Cause No. 884"). The notice of appeal stated the following

8

regarding the appealed order: "State of Indiana v. Christopher M. Montgomery, Order for Post-Conviction Relief Granting New Direct Appeal." On November 5, 2013, the State filed a notice of appeal under the same cause number. On December 17, 2013, this court issued an order assigning a new "CR" cause number to Montgomery's appeal, later assigned as Cause No. 49A02-1312-CR-1039 ("Cause No. 1039"), while allowing the State's appeal to continue under Cause No. 884. The order also stayed Montgomery's appeal pending the completion of the State's appeal. On January 13, 2014, the State filed a Motion to Dismiss the Post-Conviction appeal, which this court granted on February 3, 2014. On February 27, 2014, this court issued an order lifting the stay and directing the record from the underlying jury trial proceedings be transferred to Cause No. 1039.

## DISCUSSION

Before addressing the issues raised by Montgomery, we discuss the propriety of the post-conviction court's order that Montgomery be granted a second direct appeal as a result of its determination that he received ineffective assistance of appellate counsel. To the extent that this appeal is rooted in underlying post-conviction proceedings, we observe that such proceedings are "quasi-civil" in nature and "create[] a narrow remedy for subsequent collateral challenges to convictions, which must be based on grounds enumerated in the post-conviction rules." Lambert v. State, 743 N.E.2d 719, 725-726 (Ind. 2001) (quoting Williams v. State, 724 N.E.2d 1070, 1076 (Ind. 2000) (citations omitted), reh'g denied, cert. denied, 531 U.S. 1128, 121 S. Ct. 886 (2001)). Also, the Indiana Supreme Court has declared repeatedly that "[t]he post-conviction procedures do not provide a petitioner with a 'super-appeal' or opportunity to consider freestanding

9

claims that the original trial court committed error. Such claims are available only on direct appeal." Id. at 726 (quoting Williams, 724 N.E.2d at 1076).

Generally, to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. Ben-Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), reh'g denied), reh'g denied, cert. denied, 534 U.S. 830, 122 S. Ct. 73 (2001). We apply the same standard of review to claims of ineffective assistance of appellate counsel as we apply to claims of ineffective assistance of trial counsel. Williams, 724 N.E.2d at 1078. A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. French v. State, 778 N.E.2d 816, 824 (Ind. 2002). To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Perez v. State, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. French, 778 N.E.2d at 824.

Also, ineffective assistance of appellate counsel claims fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. Bieghler v. State, 690 N.E.2d 188, 193-195 (Ind. 1997) (citing *Lissa Griffin, The Right to Effective Assistance of Appellate Counsel*, 97 W. VA. L. REV. 1, 21-22 (1994)), reh'g denied, cert. denied, 525 U.S. 1031, 119 S. Ct. 550 (1998). Here, the post-

10

conviction court concluded that Montgomery received ineffective assistance of appellate counsel based upon the second category when counsel failed to raise the issue of the trial court's decision to exclude certain evidence pursuant to Ind. Evidence Rule 404(b). The Indiana Supreme Court has observed regarding this class of ineffective assistance claims that "[a]lthough the convict in this instance received appellate review of at least some issues, the procedural prejudice from this type of error can still be formidable." Bieghler, 690 N.E.2d at 193. The Court went on to observe that "[i]neffectiveness is very rarely found in these cases" because "the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel," and it noted that "reviewing courts should be particularly deferential to counsel's strategic decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable." Id. at 193-194. The Court directed that "[i]n analyzing this sort of case" the reviewing court, "under its performance analysis, first looks to see whether the unraised issues were significant and obvious upon the face of the record," and that "[i]f so, that court then compares these unraised obvious issues to those raised by appellate counsel, finding deficient performance only when ignored issues are clearly stronger than those presented."[3] Id. at 194 (quotations omitted). The Court noted that "the reviewing court should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy," and it "should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made." Id.

---

[3] In so holding, the Bieghler Court adopted the approach espoused by the Seventh Circuit. 690 N.E.2d at 194 (citing Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

11

Where the reviewing court on post-conviction determines that ineffective assistance of appellate counsel was rendered on direct appeal regarding a defendant's conviction, the proper remedy is to vacate the conviction and sentence imposed thereon. See, e.g., Henley v. State, 881 N.E.2d 639, 653 (Ind. 2008) (holding that the defendant received ineffective assistance of appellate counsel regarding a claim of insufficient evidence to support an attempted murder conviction, reversing the post-conviction court on that issue, and remanding with instructions to vacate the conviction and the sentence imposed thereon). We note that, unlike cases where a conviction is vacated for insufficiency of the evidence and retrial is precluded based upon double jeopardy principles, here Montgomery was found to have received ineffective assistance of appellate counsel with regard to an evidentiary issue, and accordingly Montgomery is subject to retrial.

Indeed, this case is not unlike Gray v. State, 841 N.E.2d 1210 (Ind. Ct. App. 2006), trans. denied, in which we noted that when the reviewing court on post-conviction determines that ineffective assistance of appellate counsel was rendered on direct appeal regarding a defendant's conviction, the proper remedy is to vacate the conviction and sentence imposed thereon. In Gray, defendant Gray argued that "his appellate counsel rendered deficient performance when she failed to raise the denial of the motion to sever a charge of unlawful possession of a firearm by a [serious violent felon ("SVF")] from the charges of murder, attempted murder, and robbery," noting that his appellate counsel "erroneously concluded that the issue was not preserved." 841 N.E.2d at 1213-1214. Gray noted that trial counsel, prior to voir dire, "moved to sever the possession by a SVF

12

count from the four other counts, noting that the court had discretion to do so where concerns of fairness and undue prejudice arise," that trial counsel "was concerned about the ability of a defendant to receive a fair trial on the murder and attempted murder charges if the jury was informed that the defendant is a 'serious violent felon,'" and that following the denial of trial counsel's motion to sever and Gray's subsequent conviction, trial counsel wrote on the Pre-Appeal Form "under 'potential issues for appeal' only the following: 'Gray was also charged with unlawful possession of a firearm by a serious violent felon. The court denied request for severance and to bifurcate so jury heard about previous felony convictions during murder trial.'" Id. at 1214-1216. Appellate counsel did not brief this issue and instead raised two issues and challenged a sentencing enhancement and the sufficiency of evidence as to Gray's attempted murder conviction. Id. at 1216. This court affirmed Gray's conviction. Id.

Following the denial of Gray's post-conviction petition, this court opined that "neither issue raised in Gray's direct appeal was particularly strong or groundbreaking" and that "[c]onversely, the issue of severance/bifurcation of an SVF count from other counts was truly undecided during the time of Gray's trial and appeal." Id. at 1217. We noted that "[a]lthough trial counsel preserved the severance/bifurcation issue, appellate counsel failed to raise the issue. She failed to do so despite the Pre-Appeal Form's clear directive, without having reviewed the relevant portion of the transcript, . . . [and] chose instead two issues with 'little chance of success.'" Id. at 1218 (quoting Fisher v. State, 810 N.E.2d 674, 677 (Ind. 2004)). We found that performance was accordingly deficient. Id. at 1218-1219. Similarly, we found that prejudice was present, noting that we did not

believe "that the evidence presented against Gray was 'very strong'" and that "rather than being presented with overwhelming evidence that Gray had committed the charged violent crimes, the jury had to make some serious credibility determinations" and, in doing so, "was informed that Gray was a SVF and was left to speculate as to which violent felony or felonies Gray had already committed." Id. at 1219-1220. We found that "[c]onsequently, we can easily envision the jury's determinations being tainted by the references to Gray as a SVF" and that "had Gray's appellate counsel raised the severance/bifurcation issue, it is reasonably probable that reversal would have ensued . . . ." Id. at 1220. We reversed the denial of Gray's petition for post-conviction relief and remanded the case for a new trial. Id.

As noted above, in this instance the post-conviction court, although finding that Montgomery's appellate counsel was ineffective, did not vacate his conviction and remand to the trial court for a new trial. Perplexingly, it instead simply ordered that Montgomery be allowed to bring a second direct appeal and raise the issue previously unaddressed by his initial appellate counsel.[4] Such a step is improper because when a

---

[4] Ind. Post-Conviction Rule 1(1)(b) provides:

> This remedy is not a substitute for a direct appeal from the conviction and/or the sentence and all available steps including those under Rule PC 2 should be taken to perfect such an appeal. Except as otherwise provided in this Rule, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence and it shall be used exclusively in place of them.

Additionally, Ind. Post-Conviction Rule 2(1)(a) provides:

> Required Showings. An eligible defendant convicted after a trial or plea of guilty may petition the trial court for permission to file a belated notice of appeal of the conviction or sentence if;
>
> > (1)     the defendant failed to file a timely notice of appeal;

14

post-conviction court makes a determination that ineffective assistance of appellate counsel has been rendered, it necessarily finds under the prejudice prong that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Regarding this standard, we note that when this court determines that such "reasonable probability sufficient to undermine confidence in the outcome" exists, it does not then order the issue to be briefed on a subsequent direct appeal. Rather, as demonstrated in <u>Gray</u>, the remedy is to vacate the defendant's conviction and, where proper, order a new trial. We do not believe that the remedy

---

> (2)     the failure to file a timely notice of appeal was not due to the fault of the defendant; and
>
> (3)     the defendant has been diligent in requesting permission to file a belated notice of appeal under this rule.

Thus, Montgomery's instant appeal is not within the scope of Post-Conviction Rule 2. Moreover, we note that Ind. Post-Conviction Rule 1(6), titled "Judgment," provides as follows:

> The court shall make specific findings of fact, and conclusions of law on all issues presented, whether or not a hearing is held. If the court finds in favor of the petitioner, it shall enter *an appropriate order with respect to the conviction or sentence* in the former proceedings, and any supplementary orders as to arraignment, retrial, custody, bail, discharge, correction of sentence, or other matters that may be necessary and proper. This order is a final judgment.

(Emphasis added). The Post-Conviction Order is not "an appropriate order with respect to the conviction or sentence" where it simply ordered that Montgomery be allowed to bring a second direct appeal briefing a previously unraised issue. We are not aware of authority for such an order. But <u>see</u> <u>Mason v. State</u>, 689 N.E.2d 1233, 1235-1236 (Ind. 1997) (authorizing a second direct appeal at the request of the State following an order by the U.S. Court of Appeals, Seventh Circuit, remanding to the district court with instructions to grant a writ of habeas corpus "unless [the defendant] received a new trial or a second direct appeal" on the basis that "appellate counsel's performance was deficient because counsel failed to raise a 'significant' and 'obvious' issue for reasons that could not 'be explained by any strategic decision,'" in which the Seventh Circuit noted that "it remained for an Indiana state court to decide whether [the defendant's] hearsay argument is persuasive . . ."); <u>Shaw v. Wilson</u>, 721 F.3d 908, 919-920 (7th Cir. 2013) (remanding to the U.S. District Court for the Southern District of Indiana with "instructions to issue a writ of habeas corpus unless the State of Indiana grants [the defendant] a new appeal within 120 days" on the basis that the defendant demonstrated ineffective assistance of appellate counsel, and noting that "the relief to which [the defendant] is entitled is a new direct appeal"), <u>reh'g</u> <u>denied</u>, <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u>, <u>cert.</u> <u>denied</u>, 134 S. Ct. 2818 (2014).

afforded a defendant who demonstrates that a reasonable probability exists is changed where the post-conviction court, rather than a court on appeal, determines that a defendant received ineffective assistance of appellate counsel, because the relevant inquiry is the same. Accordingly, barring an appeal by the State of the Post-Conviction Order, there would be no need for this court to effectively re-analyze this question.

The post-conviction court erred when it ordered that Montgomery be allowed to bring a second direct appeal and brief an issue which, due to what it determined to be ineffective assistance of appellate counsel, had not been briefed in his initial appeal. Under these circumstances, however, we find the post-conviction court's error did not prejudice Montgomery's substantial rights because, for the reasons discussed below, we find that the trial court did not abuse its discretion when it excluded certain evidence. Further, we prefer to decide issues on the merits. See, e.g., Shoultz v. State, 995 N.E.2d 647, 659 (Ind. Ct. App. 2013) (noting that "[w]hile we encourage practitioners and others appearing before this Court to follow the precise instructions of the Appellate Rules rather than simply the 'spirit' of the Rules, we also prefer to decide cases and issues on the merits," and addressing the merits of the defendant's appeal), trans. denied. Additionally, the State has not moved to dismiss this appeal, and in fact on January 13, 2014 the State moved to dismiss *its* appeal of the Post-Conviction Order, which this court granted on February 3, 2014. The State's decision to dismiss its appeal allowed Montgomery's second direct appeal to proceed, which had been stayed pending the State's appeal of the Post-Conviction Order. Accordingly, we will address the issues raised. See Collins v. State, 873 N.E.2d 149, 157 (Ind. Ct. App. 2007) (noting that "[t]his

16

court will disregard technical errors or defects which did not prejudice the substantial rights of a defendant" (quoting Brown v. State, 245 Ind. 604, 609, 201 N.E.2d 281, 283-284 (1964) (citing Wright v. State, 237 Ind. 593, 147 N.E.2d 551 (1958)))), trans. denied.

## I.

The first issue is whether the trial court abused its discretion by excluding certain evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Hardiman v. State, 726 N.E.2d 1201, 1203 (Ind. 2000). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances presented. Id. "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." Fleener v. State, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted). In other words, we will find an error in the exclusion of evidence harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights. Williams v. State, 714 N.E.2d 644, 652 (Ind. 1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195 (2000).

Montgomery argues that he is entitled to present evidence that another person committed the crime for which he is charged and that the court was not justified in its decision to exclude "the evidence of a pattern of abuse by Courtney in this case." Appellant's Brief at 16. In his brief, Montgomery summarizes the evidence presented at the hearing on February 20, 2008, as follows:

1. Three prospective defense witnesses, Dale Toon, Lucille Ewetuga, and Cecile Harrison, witnessed Courtney beating [Elijah] with a belt on March 23, a week before he died. [App. 227, Exhibits A, B, C].

17

a. Some of this evidence was admitted at trial. Dale Toon was the manager of the hotel. [Tr. 321]. He testified that a week before [Elijah] died, another hotel guest came to him to report that a baby was screaming, and a woman was "yelling and cursing." [Tr. 323]. Toon went to investigate and could hear the crying and cursing from ten rooms away. [Tr. 323]. He waited about a minute outside the door before knocking. [Tr. 324]. Courtney opened the door and Toon asked her what was happening. [Tr. 324]. Courtney said "this m-----f----- sh-t on himself and he knows how to ask when he [] wants to play a game, but doesn't want to tell me when he goes and sh-ts on himself[.]" [Tr. 324]. Toon insisted on seeing "the baby" for himself to make sure he was all right. [Tr. 324-325]. The child was crying but Toon did not see any injuries. [Tr. 329]. Toon told Courtney she needed to calm down or he would call the police. [Tr. 325]. Courtney responded "Well, it's my kid. I'll do what I want to do to him." [Tr. 325]. Toon saw an adult male on the bed playing a game. [Tr. 326]. He was "90 percent sure" the man was not Christopher [Tr. 326], but he did not know who it was. [Tr. 328].

2. In October, 2004, Courtney's son [Casey], then age 3, suffered a "substantial but closed depressed skull fracture" from being hit with a rock. [Tr. 547, App. 229, 405]. Courtney "elected not to [have Casey] undergo the [recommended] surgery despite multiple physicians counseling her otherwise." [App. 405]. At the time, [Montgomery] was in prison for a different conviction. [Confidential Appendix / Presentence Investigation Report pages 5-6].

   a. The trial judge ruled that evidence about this injury was inadmissible because it was too remote in time, involved a different child, and that it was propensity evidence inadmissible under Ind. Evidence Rule 404(b). [Tr. 547-50].

3. Other witnesses had told the State in taped statements that Courtney would discipline [Elijah] by making him stand in the corner, tying his hands above his head to prevent him from sucking his thumb, and beating him for wetting his pants. [App. 227].

   a. Clamenta Twyman is [Montgomery's] mother. [Confidential Appendix / Presentence Investigation Report

18

page 8]. She spoke to [Montgomery] or Courtney every day by telephone. [App. 227]. During a phone call in February or March 2007, she heard [Elijah] crying, and Courtney told her that she was punishing him by making him stand in the corner. [App. 227]. On one occasion in February, Courtney came home drunk and pulled out a braid of [Montgomery's] hair. [App. 227].

   i. The trial court excluded the evidence from Clamenta Twyman on the grounds that it was "blatant hearsay" and only tended to show Courtney's "propensity to do these types of acts." [Tr. 533].

b. Christian Montgomery is [Montgomery's] half-brother. [Confidential Appendix / Presentence Investigation Report page 9]. He saw [Elijah] lying on the floor in the hotel room with his hands tied, while [Montgomery] was not there. [App. 227]. Courtney told Christian "I had to start tying him up." [App. 228].

   i. At the hearing on the admissibility of 404(b) evidence, the Court ruled that if the State presented evidence that Christopher tied [Elijah's] hands, this evidence against Courtney would be admissible. [Tr. 535]. The State agreed not to present testimony that Christopher tied [Elijah] up, nor photographs of the ligature marks on [Elijah's] wrists. [Tr. 534-535]. The State amended the charging information to remove references to that allegation. [Tr. 14-17].

c. Terry Robinson noticed a band-aid on [Elijah's] head on March 25, 2007. [App. 228]. Courtney and [Casey] both said that [Elijah] had tripped and hit his head on a table. [App. 228]. In 2006, Courtney spanked [Elijah] for wetting his pants. On March 30, 2007, after Christopher was arrested, Courtney told Robinson "Chris didn't do anything." [App. 228].

   i. The trial court ruled that the band-aid evidence was "speculative" and

19

inadmissible. [Tr. 536]. Evidence that Courtney spanked [Elijah] for wetting his pants in 2006 was excluded as "too remote in time" and "goes to show that she's a bad person." [Tr. 536].

d. Brian Trammel saw Courtney "whuppin" [Elijah] at a Super Bowl party in February 2007. During the week before [Elijah's] death, Courtney called Christopher "continuously" while he was out with Trammel buying a phone, accusing Christopher of being out with other women. [App. 228].

   i. The trial court ruled that the evidence about Courtney beating [Elijah] would only be relevant and admissible at trial if there was evidence that [Elijah's] death was the result of a pattern of abuse, rather than the result of a single blow to the head. [Tr. 540-542].

e. In March, eight or nine days before [Elijah's] death, Alicia Harris saw Courtney take out her anger with Christopher on the children by hitting them. [App. 228].

   i. The trial court ruled that this evidence about Courtney beating the children would only be admissible if the pathologist's testimony showed a pattern of abuse that led to [Elijah's] death. [Tr. 546].

f. Courtney admitted to Wanda Goldsmith in 2006 that she had lied to an investigator from Child Protective Services. [App. 228-229]. Courtney had been beating her children and someone called CPS, but the investigator left when Courtney told them she was "only beating the dog." [App. 228-229].

   i. The trial court ruled that this evidence about Courtney beating the children would only be admissible if the pathologist's testimony showed a pattern of abuse that led to [Elijah's] death. [Tr. 547].

20

4. Courtney's father Lawrence Simpson had called the Department of Child Services twice in the two years before [Elijah's] death, out of concern for his grandchildrens' safety and Courtney's behavior. [App. 229]. Christopher was incarcerated at the time. [App. 229].

      i. The trial court ruled that this evidence would be inadmissible unless there was evidence that a pattern of beating resulted in [Elijah's] death. [Tr. 550-551].

Id. at 11-15 (footnote omitted).

In sum, with the exception of the proffered testimony of Clamenta Twyman, Montgomery's mother, which the court excluded as hearsay, the court's decision to exclude each of the remaining pieces of proffered evidence was based at least in part on relevance. That is, the court ruled based upon Ind. Evidence Rule 401 that the proffered testimony was not relevant. Ind. Evidence Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Here, the bases for the court's rulings were either that such evidence was too remote in time or was offered to establish a pattern of abuse which was not the theory of the State's case for how Elijah died.

In arguing that the trial court abused its discretion when it ruled to exclude the evidence discussed above, Montgomery directs our attention to the Indiana Supreme Court's decision in Rohr v. State, 866 N.E.2d 242 (Ind. 2007), reh'g denied. In Rohr, five-year-old Samuel Moore died four days after being taken to the hospital by Defendant Rohr and Samuel's mother Donna Moore, with whom Rohr had been living for about two months. 866 N.E.2d at 243-244. Rohr was charged with murder as a result of Samuel's death, and at trial the State presented evidence that Samuel had sustained blunt force head

21

trauma, a severe brain injury, and bruising on the back, front, and inside of his thighs, his left elbow, his groin area, his chin, his waist, both sides of his bottom, his back, and his penis and scrotum, which were also swollen. Id. at 244. The State's evidence demonstrated that both the defendant and Moore had engaged in regular corporal punishment of Samuel and indicated that Moore had previously been investigated by the Department of Job and Family Services in Belmont County, Ohio, for physical harm to Samuel. Id. Prior to trial, the court granted a motion to exclude filed by the State prohibiting Rohr from calling and presenting the testimony of two witnesses, Rosanne Palmer and Melissa Scott. Id. at 245. Rohr was found guilty of murder and sentenced to life without parole. Id. at 244.

On appeal, the Court addressed what it determined to be the dispositive issue of whether Rohr was denied a fair trial when the court excluded the testimony of Palmer and Scott. The Court began its analysis by discussing the circumstances leading to the trial court's ruling as follows:

> On June 6, 2005, the trial court established a schedule that included: jury trial to begin August 1, 2005; all discovery and motions to be complete by June 30, 2005; and final witness and exhibit lists to be exchanged and filed by July 1, 2005. The scheduling order emphasized in boldface, all caps type: "ANY WITNESSES OR EXHIBITS NOT DISCLOSED BY THIS DATE, WILL ABSOLUTELY BE EXCLUDED AT TRIAL." Appellant's App'x. at 62. On the discovery deadline date, June 30, one day before the July 1 deadline for filing witness and exhibit lists, the State filed its witness and exhibit lists along with a notice that it had on that date "discovered" to the defendant's counsel 45 items of discovery, which consisted of 853 pages plus 30 photographs, 2 video tapes, 3 CDs, and 1 audio tape. Id. at 95. The State certified that a copy of the notice was mailed to the defendant's attorney on June 30, 2005. On the same date, the State also filed a motion in limine seeking to prohibit the defense from "eliciting any evidence" regarding both "a welfare report" prepared in April 2002 by the "Belmont (Ohio) County Department of Job & Family

22

Services," and "[a]ny incidents or allegations referred to" in the report. Id. at 98. The subsequently excluded witnesses, Melissa Scott and Roseanne Palmer, were not listed on the State's witness list, but their names appeared on pages 45, 47, and 48 of the Belmont County Department of Job and Family Services Report, one of the items the State furnished to the defense on June 30. Id. at 95, 428, 430, 431. The defendant's witness and exhibit list, filed on July 1, did not include the names of Roseanne Palmer and Melissa Scott, nor did it list the Belmont County report as a defense exhibit. But it did include "any person named in the discovery provided to the defendant" and any discovery or exhibit "provided by the State in its discovery." Id. at 100. On July 14, two weeks before the commencement of trial, the court denied the State's June 30 motion in limine "insofar as it seeks to prohibit the introduction of evidence relating to Donna Moore's alleged abuse of Samuel in the State of Ohio in 2002." Id. at 119.

The defendant first named Roseanne Palmer and Melissa Scott as defense witnesses in his Amended Witness and Exhibit List filed on July 28. See id. at 199-201. The next day, the State filed its motion to exclude the two witnesses, arguing that they "were not listed as witness [sic] for the defense until . . . approximately thirty (30) days past the discovery deadline date and four (4) days before the scheduled jury trial." Id. at 217. The State's request did not seek a continuance but sought only the exclusion of the witnesses' testimony. The State raised no other objection. Notwithstanding the defendant's objection to the motion citing the State's delay in providing the report that included the names of Roseanne Palmer and Melissa Scott until just one day before the final witness lists were due, and asserting that the defense could not determine its final defense strategy or witnesses until review of the State's voluminous information, the trial court, on the first day of trial, granted the State's motion to exclude these witnesses.

Id. at 244-245.

The Court reversed the trial court's ruling on the motion to exclude and remanded for a new trial. Id. at 249. The Court observed that trial courts have discretion to exclude belatedly disclosed witnesses "when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State." Id. at 245 (quoting Williams, 714 N.E.2d at 651). It noted that, "[s]ignificantly," the State in this case never asserted that the defense acted in bad faith and that "[i]f the four days before trial were truly

23

insufficient for reasonable investigation by the State, a short continuance would have been the appropriate remedy." Id. at 246. The Court found the State knew of the challenged witnesses at some point before June 30th when it disclosed their names to the defense and that the record did not suggest that the defense had prior knowledge of them. Id. It further found that "[t]he potential importance of the witnesses' testimony to the defense may be inferred from the State's efforts to exclude their testimony," noting specifically that the State filed a motion in limine seeking to prohibit the introduction of evidence related to Donna Moore's alleged abuse of Samuel in 2002 which contained "entries to the effect that Melissa Scott and Roseanna Palmer had witnessed Donna Moore's abusive treatment of Samuel since he was six months old" and that:

> Because of the State's awareness of these witnesses and their importance and its opportunity to interview or depose them for more than a month before trial, we find that permitting them to testify would not have resulted in substantial or irreparable prejudice to the State. To the contrary, the exclusion of these witnesses resulted in substantial prejudice to the defense, as further described below. We further find that the defendant's delay in adding these witnesses to his witness list was neither purposeful nor intentional. The trial court should not have prevented the defense from calling Roseanne Palmer and Melissa Scott as witnesses.

Id.

The Court further noted that such errors are subject to harmless error analysis and that the State asserted harmless error because "evidence to be provided by the excluded witnesses was placed before the jury through Moore's own testimony and the redacted version of the investigation report made by the authorities in Ohio." Id. at 246-247 (internal quotations omitted). Rohr argued that Moore's testimony acknowledged the allegations but "did not actually admit to the incidents for which she was being

24

investigated in Ohio," and indeed that she denied the conduct to which Scott and Palmer would have testified to witnessing. Id. at 247. The State at trial "presented considerable evidence of Samuel's extensive injuries, *most of which were not directly involved in causing his death*," including injuries to Samuel's "thighs, his left elbow, his groin area, his chin, his waist, both sides of his bottom, his back, and his penis and scrotum." Id. (emphasis added). The Court held that "[i]n light of the State's evidence, it was proper for the defense to seek to support its claim that Samuel's extensive injuries, *purportedly the result of a pattern of child abuse*, were caused by Donna Moore, not the defendant," and that accordingly such error was not harmless. Id. (emphasis added).

The State argues that Rohr is distinguishable because evidence was presented in that case of a pattern of abuse and that we should follow this court's opinion in Lush v. State, 783 N.E.2d 1191 (Ind. Ct. App. 2003), and affirm the trial court. In Lush, Defendant Lush was at home in Columbus, Indiana, with his two-year old son and his two-year old stepdaughter, H.R., while H.R.'s mother Angela was working. 783 N.E.2d at 1193. H.R. appeared fine when Angela left for work, as well as when she returned home for lunch at approximately 11:00 a.m. Id. Lush and the children drove Angela back to work at 11:15 a.m., and then he and the children returned home. Id. Sometime after 12:30 p.m., a neighbor observed Lush leaving the house with H.R. in his arms and moving at a normal pace. Id. Lush called Angela and asked her to meet him in front of her work. Id. A coworker of Angela's was sitting outside from about 1:30 p.m. to 1:45 p.m., and during that time she observed Lush drive up to the building at a fairly normal speed, that Angela spoke with Lush at the car, and that then Angela hurried back inside

and ran back out to the car after a few minutes. Id. at 1193-1194. While Angela was inside, the coworker also observed Lush shake H.R., who was in his lap, as if to wake her. Id. at 1194. Angela and Lush then left in the car fairly quickly. Id.

H.R. arrived at the hospital at approximately 2:00 p.m. and was unconscious and not breathing. Id. She was flown to Riley Hospital for surgery to relieve the pressure on her brain from an acute subdural hematoma that was collecting blood and was rapidly herniating her brain stem. Id. Doctors discovered that H.R. had sustained linear bruising on her legs and her back, that her eyes were swollen and she had retinal hemorrhaging not consistent with an accidental injury, and that she also exhibited substantial bruising on her face and neck. Id. The doctors noted that she had fading bruises on her arms and chest, but the coloration of the other bruises indicated that they had been formed recently. Id. The doctors noted that the acute subdural hematoma likely was inflicted by an angular momentum that rendered H.R. immediately unconscious. Id. They noted that "[t]hose injuries appeared to have been inflicted within a few hours prior to H.R.'s arrival at the emergency room in Columbus, and a maximum of six hours prior to her arrival there." Id. H.R. was in a medically induced coma for two weeks and sustained permanent damage to her brain. Id. Lush was found guilty by jury trial of aggravated battery and neglect of a dependent, both as class B felonies. Id.

On appeal, Lush argued that the court erred by excluding the testimony of two witnesses, Patricia Goodlow and Shauna Smith, regarding Angela's treatment of H.R., as well as Angela's son's behavior, as not being relevant. Id. This court affirmed the rulings of the trial court, noting first that Smith's testimony related to Angela's son's

26

behavior was irrelevant because her son "was not present at the house at the time that H.R. received her life-threatening injuries. Therefore, any testimony concerning the son's behavior was irrelevant to the charges, aggravated battery and neglect of a dependent, against [Lush]." Id. at 1195. The court next addressed certain testimony Lush attempted to elicit from Smith "that Angela frequently picked up H.R. by the arms" and held that such "testimony is irrelevant to the charges, aggravated battery and neglect of a dependent, against [Lush]. The bruising on H.R.'s arms was not the life-threatening injury that was the subject of the aggravated battery charge against [him]." Id. Last, the court addressed testimony Lush attempted to elicit from Goodlow "that she did not approve of Angela's parenting skills[] and had problems with Angela's care of H.R. before Defendant became a member of the household," and it again found such testimony to be irrelevant "because it had no relevance to the instant charges against [Lush]." Id.

Montgomery argues that the Lush case is distinguishable because in Lush the child's mother was not home and thus could not have caused the deadly injuries to the child herself. We find, however, that under these circumstances such a distinction is immaterial. Here, in making its evidentiary rulings five days before the jury trial, the trial court did so based upon what it understood to be the State's theory of the case that Elijah's death was caused by the single injury of being thrown to the ground, but it recognized that its rulings were "preliminary" and "certainly subject to change as [it] listen[ed] to the evidence . . . ." Transcript at 552. As noted above, the evidence presented at trial included testimony by Detectives Rogers and Kennedy in which they recounted an interview they conducted with Montgomery and testified that Montgomery

27

initially denied any wrongdoing. They testified that later in the interview, Montgomery began talking about the date in question and eventually admitted that he "picked Elijah up and dropped him" to punish Elijah. Id. at 222. Montgomery first indicated that he dropped Elijah from a height of "just above his knees," but after Detective Kennedy told him that the injuries did not match what Montgomery was describing, Montgomery gave two other explanations in which both the height and the manner in which Elijah was thrown were changed. Id. In Montgomery's second explanation, he demonstrated that he held Elijah from a "mid torso" height and let go, but in his third explanation he demonstrated that he picked Elijah up to "his head level and tossed." Id. at 225. Further, Montgomery does not point to the record demonstrating that he ever attempted to admit any of the challenged evidence at the jury trial.

We find that, similar to the evidence excluded in Lush, the challenged evidence was properly excluded as not relevant because such evidence was in the nature of a pattern of abuse on the part of Courtney and was irrelevant to the charges against Montgomery. Indeed, the Rohr case, upon which Montgomery relies, is distinguishable on this very basis because in Rohr evidence of a pattern of abuse by the mother Donna Moore *had* been introduced by the State, which led the Indiana Supreme Court to hold specifically that "[i]n light of the State's evidence, it was proper for the defense to seek to support its claim that Samuel's extensive injuries, *purportedly the result of a pattern of child abuse*, were caused by Donna Moore, not the defendant," and that accordingly such error was not harmless. 866 N.E.2d at 247 (emphasis added).

Here, the trial court recognized that the sole issue at trial was who inflicted the blunt force trauma that killed Elijah and found that evidence of Courtney's pattern of abuse of Elijah was not admissible to show that she committed the offenses unless Montgomery could show that Elijah's death was caused by a pattern of abuse. He failed to do so, and indeed evidence was presented that he confessed to detectives that he threw Elijah to the ground in a manner consistent with the injury causing death. Montgomery did not attempt to admit evidence of Courtney's pattern of abuse following the pretrial hearing. Finally, to the extent the court excluded the testimony of Clamenta Twyman as hearsay, including that Twyman would have testified that Courtney told her that she was punishing Elijah by making him stand in a corner, we note that Montgomery does not specifically challenge the court's ruling on that proffered testimony in his brief. We also find that such evidence was not relevant to determining who caused the fatal injury. We conclude that the court thoughtfully parsed the prospective evidence at the hearing on February 20, 2008, and that it did not abuse its discretion in excluding certain evidence.

II.

The next issue is whether Montgomery's conviction of neglect of a dependent as a class B felony violates double jeopardy principles.[5] The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to

---

[5] The State argues that we should not address Montgomery's double jeopardy issue because this appeal stems from an order of the post-conviction court and is limited to the evidentiary issue addressed in Part I. We note, however, that this court must address double jeopardy violations *sua sponte* where they exist because "a double jeopardy violation, if shown, implicates fundamental rights." Smith v. State, 881 N.E.2d 1040, 1047 (Ind. Ct. App. 2008). For the reasons discussed below, we find that Montgomery's conviction for neglect of a dependent as a class B felony violates double jeopardy principles, and accordingly we shall address the issue.

29

proceed against a person twice for the same criminal transgression." Hopkins v. State, 759 N.E.2d 633, 639 (Ind. 2001) (quoting Richardson v. State, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." Richardson, 717 N.E.2d at 49.

In addition, Indiana courts "have long adhered to a series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in Richardson." Guyton v. State, 771 N.E.2d 1141, 1143 (Ind. 2002) (quoting Pierce v. State, 761 N.E.2d 826, 830 (Ind. 2002) (citing Richardson, 717 N.E.2d at 55 (Sullivan, J., concurring))). "Even where no constitutional violation has occurred, multiple convictions may nevertheless violate the 'rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in Richardson.'" Vandergriff v. State, 812 N.E.2d 1084, 1088 (Ind. Ct. App. 2004) (quoting Pierce, 761 N.E.2d at 830), trans. denied. As enumerated in Justice Sullivan's concurrence in Richardson and endorsed by the Indiana Supreme Court in Guyton, five additional categories of double jeopardy exist: (1) conviction and punishment for a crime which is a lesser-included offense of another crime for which the defendant has been convicted and punished; (2) conviction and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished; (3) conviction and punishment for a

crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished; (4) conviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished; and (5) conviction and punishment for the crime of conspiracy where the overt act that constitutes an element of the conspiracy charge is the very same act as another crime for which the defendant has been convicted and punished. See Guyton, 771 N.E.2d at 1143; Richardson, 717 N.E.2d at 55-56 (Sullivan, J., concurring).

Montgomery argues that his conviction under Count III for neglect of a dependent as a class B felony must be reduced to a class D felony based upon the case of Strong v. State, 870 N.E.2d 442 (Ind. 2007). In Strong, Defendant Strong was convicted for the murder of his girlfriend's three-year-old daughter, Taranova Glick, and neglect of a dependent resulting in the same child's death, as a class A felony. 870 N.E.2d at 442. He was sentenced to consecutive terms of sixty-five years for murder and fifty years for class A felony neglect. The Indiana Supreme Court observed on appeal that "[u]nder the rules of statutory construction and common law that constitute one aspect of Indiana's double jeopardy jurisprudence, where one conviction 'is elevated to a class A felony based on the same bodily injury that forms the basis of [another] conviction, the two cannot stand.'" Id. at 443 (quoting Pierce, 761 N.E.2d at 830 (Ind. 2002)). The Court noted that the murder count charged Strong with knowingly killing Taranova and the neglect of a dependent resulting in death count "alleged that [Strong], who had care of three-year-old Taranova Glick as a dependent, knowingly placed her 'in a situation

31

endangering her life or health,' allowing her 'to languish and suffer without medical treatment knowing she had been gravely injured, all of which resulted in the death of Taranova Glick.'" Id.

The State in Strong argued that any double jeopardy violation "may be adequately addressed by reducing the neglect count from a class A to a class B felony" because "the murder and neglect convictions 'were based on two completely different sets of actions as the murder happened when [d]efendant placed his knee into Taranova's abdomen and the neglect happened thereafter when he did not seek medical attention.'" Id. The Court observed the relevant statute, Ind. Code § 35-46-1-4,[6] and noted that "[t]he offense of

---

[6] We note that the incident in question occurred in March 2007 and that the version of Ind. Code § 35-46-1-4 applicable to Montgomery is substantially similar to the version in Strong and provides in relevant part as follows:

    (a)      A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:

           (1)     places the dependent in a situation that endangers the dependent's life or health;
           (2)     abandons or cruelly confines the dependent;
           (3)     deprives the dependent of necessary support; or
           (4)     deprives the dependent of education as required by law;

        commits neglect of a dependent, a Class D felony.

    (b)      However, the offense is:

           (1)     a Class C felony if it is committed under subsection (a)(1), (a)(2), or (a)(3) and:

                (A)     results in bodily injury . . .

                    * * * * *

           (2)     a Class B felony if it is committed under subsection (a)(1), (a)(2), or (a)(3) and results in serious bodily injury;

           (3)     a Class A felony if it is committed under subsection (a)(1), (a)(2), or (a)(3) by a person at least eighteen (18) years of age

32

neglect of a dependent, absent a resulting injury, is defined as a class D felony." Id. (citing Ind. Code § 35-46-1-4(a)). It further noted that this crime "is a class C felony when it 'results in bodily injury' . . . a class B felony when it 'results in *serious* bodily injury,' and a class A felony when it 'results in the death of a dependent who is less than fourteen (14) years of age.'" Id. (quoting Ind. Code §§ 35-46-1-4(b)(1)-4(b)(4)). Based upon this statutory language, the Court disagreed with the State's argument that reclassifying the neglect of a dependent conviction as a class B felony would alleviate the double jeopardy issue, stating that "[s]uch a recharacterization of the charges . . . does not eliminate the fact that both charged offenses would still be based on the same bodily injury." Id. at 444. It specifically found that "[t]he injuries urged to support the 'serious bodily injury' necessary for class B neglect are the same injuries, the same harm, that resulted in the child's death and are the basis of the murder charge." Id. The Court held that "[o]nly when deemed a class D offense, which does not include any element of bodily injury, does the conviction of neglect of a dependent satisfy the common law/statutory construction aspect of Indiana's double jeopardy jurisprudence," and it remanded "to the trial court to reduce the conviction for neglect of a dependent from a class A felony to a class D felony, for which the sentence shall be a term of three years, to be served consecutively to the sentence for murder." Id.

---

and results in the death of a dependent who is less than fourteen (14) years of age; and

(4)    a Class C felony if it is committed under subsection (a)(2) and consists of cruel or unusual confinement or abandonment.

(subsequently amended by Pub. L. No. 15-2007, § 1 (eff. July 1, 2007); Pub. L. No. 109-2007, § 1 (eff. July 1, 2007); Pub. L. No. 6-2012, § 227 (eff. Feb. 22, 2012); Pub. L. No. 193-2013, § 6 (eff. July 1, 2013); Pub. L. No. 158-2013, § 550 (eff. July 1, 2014); Pub. L. No. 168-2014 (eff. July 1, 2014)).

We find that the Court's reasoning in <u>Strong</u> applies with equal force to Montgomery's neglect of a dependent conviction. As in that case, Montgomery was found guilty by the jury of neglect of a dependent as a class A felony for causing the death of Elijah. The court, based on double jeopardy concerns, entered the conviction as a class B felony for failing to seek immediate medical help after Elijah sustained the head injury. However, that serious bodily injury was the same injury which led to Elijah's death. Thus, the court should have entered Montgomery's conviction on Count III as a class D felony, which applies to the crime of neglect of a dependent without any element of bodily injury. We therefore remand to the trial court with instructions to reduce Montgomery's conviction under Count III from a class B felony to a class D felony and to enter a sentence of three years to be served consecutive to Montgomery's murder sentence, for an aggregate sentence of fifty-eight years.

## CONCLUSION

For the foregoing reasons, we affirm Montgomery's conviction for murder under Count I, reverse his conviction for neglect of a dependent as a class B felony under Count III, and remand with instructions to enter a conviction under Count III for neglect of a dependent as a class D felony and to sentence him to three years thereon, to be served consecutive to his conviction for murder under Count I.

Affirmed in part, reversed in part, and remanded.

BARNES, J., and BRADFORD, J., concur.