## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 20 2019, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jovanni Torres, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 20, 2019 <br><br> Court of Appeals Case No. <br> 18A-CR-1643 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause No. <br> 45G01-1610-MR-5 |

**Altice, Judge.**

# Case Summary

Jovanni Torres appeals his conviction for murder, asserting that the trial court erred when, after granting the State's Motion to Exclude Alibi Witnesses, it did not allow him to call two witnesses. He argues that the two witnesses were rebuttal witnesses, not alibi witnesses, and that the trial court abused its discretion when it did not permit them to testify. The State maintains that the trial court properly determined that the witnesses were alibi witnesses and excluded them because Torres failed to file a notice of alibi defense or show good cause for not doing so.

We affirm.

# Facts & Procedural History

Torres began dating Aimee Giro sometime in early 2016. Giro lived with her father, Juan Giro Cruz, but she would sometimes spend overnights and weekends with Torres at his residence, which was a home owned by his mother located at 2701 New Hampshire Street, in Lake Station, Indiana.

Torres had previously been in a ten-year relationship with Elizabeth Hooper. Torres and Hooper had a child together in 2001, and although their relationship ended in 2011, Torres and Hooper remained "close" friends. *Transcript Vol. 3* at 4. Hooper took their daughter to Torres's home most weekends for their daughter to stay with him. During the late afternoon of Friday September 30, Hooper dropped off her daughter there for the weekend.

[5] On the evening of Friday September 30, 2016, Giro was going to a bachelorette party for her best friend, Jaclyn Havens. Cruz dropped off Giro at Havens's house, and from there, a group went by limousine to a Chicago nightclub. The group returned by limo to Havens's home at around 3:00 a.m., and then another friend, Tammy McHargue, drove Giro to Torres's home, dropping off Giro around 4:00 or 4:30 a.m. on October 1. McHargue asked Giro if she "would be alright" getting dropped off there, which she asked because "[Torres] was known to be abusive to her." *Transcript Vol. 2* at 85.

[6] Around 4:00 a.m., Giro sent a text message to a coworker, Eric Jorgenson. She and Jorgenson had worked together at Baker's Square restaurant for about one and one-half years and had become friends. In her text, Giro told Jorgenson that she could take his 5:00 p.m. shift that day, Saturday October 1. Jorgenson did not see the text until he woke up around noon, and he responded to Giro, but did not hear back from her. Giro did not show up for work she had offered, so Jorgenson worked the shift.

[7] At around 2:00 p.m. on October 1, Havens tried to contact Giro because Giro still had Havens's ID and some of her money from the bachelorette party, but Havens did not hear back from Giro. Havens tried to reach Giro repeatedly on October 2 and 3, and Havens's mother started calling hospitals in search of Giro. At some point, Havens contacted Giro's father, trying to find out if anyone knew where Giro was. Giro was on the Baker's Square work schedule for October 2, but she did not show up, which her manager, Linda Vankley, found unusual because, while Giro was often late, she did not miss work.

Giro's cousin, Jeannette Hard, who had a close relationship with Giro and saw her regularly, expected Giro at a family member's quinceanera party on the afternoon of October 1. Giro never came.

[8] Hooper picked up her daughter from Torres's home on Sunday, October 2. Torres opened the back door and sort of "pushed" his daughter outside and closed the door without speaking to Hooper, which Hooper thought was odd since they usually would have a conversation. *Transcript Vol. 3* at 18.

[9] On October 5, having not heard from his daughter in days, Cruz, accompanied by his friend Enrique Ayala, went to Torres's home. They saw foil covering the windows, flies in the windows, and noticed "a terrible smell" coming from around the closed door. *Id.* at 61. They then went to the home of Torres's mother. Torres was at the home and spoke to Cruz telling him that he had not seen Giro in a couple of days. Cruz advised he was going back to Torres's house and contacting police, which he did, after stopping briefly at one more possible location in search of his daughter.

[10] Cruz and Ayala returned to Torres's home, and Ayala called 911 at about 12:50 p.m. Police responded quickly. They saw flies inside the foil-covered windows and smelled what they recognized as decomposing body through the cracks around the back-door frame. About the same time, Torres and his brother, in separate vehicles, also arrived on the scene. Officers explained that they were there on a welfare check, looking for Giro because her family and friends could not find her. As captured on the body camera of one of the officers, Torres told

police, "I don't know where Aimee's at. She's MIA." *State's Exhibit 12A*. Police explained that they wanted to go into the house to look for her, and Torres said, "Aimee's not here. She left. She does this all the time." *Id*. When asked when he was last at the house and when he last saw Giro, Torres said it had been a couple of days. Torres, who appeared to be "nervous," explained to officers that Giro was "tired" of him "popping Adderall," so she "took off" and "hasn't come back." *Transcript Vol. 5* at 175; *State's Exhibit 12A*. An officer stated that the family was concerned, and Torres said, "I am too. I was calling her." *State's Exhibit 12A*. When officers asked Torres if he had a key, he said "Yeah but it's not my house." *Id*. They again asked for the key, and he said that he did not have a key "on him." *Id*. Thereafter, police entered the home and found a woman, later determined to be Giro, in a locked bedroom, dead on the floor between the bed and the wall, wrapped in a comforter. There was blood on the blanket and a bullet hole in the wall. Police found a spent shell casing near the lower half of her body. A Hi-Point .45 caliber pistol, which police later determined was owned by Torres, was found nearby wrapped in a robe. An autopsy revealed that Giro had been shot multiple times, and she was estimated to have died on October 1 or 2.

[11]   On October 14, 2016, the State charged Torres with one count of murder. In October 2017, the State filed an amended information adding an enhancement for use of a firearm while committing the offense of murder.

[12]   A jury trial commenced April 23, 2018, and during opening statements, defense counsel made remarks indicating that Torres was not at his home when Giro

was killed, stating "He was not in the residence.  His family was baby-sitting him trying to get him flushed – the drugs flushed out of his system." *Transcript Vol. 2* at 30.  He continued, "[Torres] was not home when Aimee was picked up and taken to the bachelor party or dropped off for [sic] the bachelor party.  He did not come home at any time while [s]he was missing." *Id*.  Thereafter, and out of the presence of the jury, the State raised the following issue:

> The answer that was filed in discovery had nothing to do with an alibi.[1]  Now [defense counsel's] clearly . . . arguing defendant wasn't there.  He was with his family.
>
> [I]f he's going to argue that there's an alibi defense, the [S]tate should have had that information at this point; otherwise, he should be precluded from arguing that.  So he's put it out there.  And now, it's hey, [S]tate, it's up to you to prove what?  He wasn't there?  I mean, we don't even know who the alibi is.

*Id.* at 33-34.  The trial court stated:

> I think case law clearly indicates that a defendant may raise alibi at any point.  And even though it's -- you know, it's a defense that ought to be raised, it's improper for a Court to preclude the defendant from raising his own alibi should he testify to that extent.  *The remedy would be if he presents late witnesses or witnesses that may talk of alibi*, now maybe we're talking about something

---

[1] The record reflects that Torres's Answer to Discovery, filed in October 2017, states as follows with regard to "Defenses": "The Defendant intends to argue insufficient evidence at the trial of this case." *Appellant's Appendix Vol. 2* at 74.

different at that point, whether an argument exists on whether the [S]tate could preclude them from testifying.

*Id.* at 34 (emphasis added).

[13]    Counsel for Torres then stated:

> The two individuals that I named[2] may or may not be rebuttal witnesses. It just depends what the [S]tate's evidence is going to be. If anybody knows them, I thought I had an obligation to bring it out. They may or may not testify, and [Torres] may or may not testify. . . . [T]he law's clear that any defendant at any time can indicate that he was somewhere other than when -- where and when the crime had been committed[.]

*Id.* at 36. The trial court directed the State to "file a motion" as to its position. *Id.* at 37.

[14]    The next day, April 24, 2018, the State filed a motion to exclude alibi witnesses. In it, the State asserted:

> During jury selection, defense counsel listed a witness whom the State was unaware of and who had not been previously tendered in discovery. The first time the State was learning of this witness was during jury selection.
>
> In opening statements, defense counsel discussed the defendant's alibi defense which was that the defendant was not present when

---

[2] Torres appears to have named two individuals as possible defense witnesses in jury selection, but this portion of jury selection is not included in the record before us.

Aimee Giro was killed, and further that the defendant was with his relatives at the time the crime was committed.

The defendant has never filed an alibi defense, has never listed any alibi witnesses, and has never given the State any information regarding the defense or witnesses.

The cure at this point is to exclude all witnesses that pertain to an alibi defense. Waiting until opening statements to mention an alibi defense does not give the State any time to investigate such claims. Simply deposing said witnesses is not a cure. The only remedy at this point should be for the Court to exclude said witnesses.

*Appellant's Appendix Vol. 2* at 109-110.

[15] The jury trial continued through April 27, 2018, during which the State presented investigative and forensic evidence showing that Giro was shot five times. A shell casing was found near her body, and it came from the Hi-Point .45 caliber pistol found in the home, which gun Torres had purchased in 2007. The last outgoing text from Giro's phone was her text to Jorgenson at 4:13 a.m. on October 1. All incoming texts messages after that time remained unread. There were frequent calls and messages from Torres's cell phone to Giro up until September 27, but not thereafter.

[16] The State also presented evidence from friends, family members, and coworkers. Jorgenson testified that, a couple of weeks before she was killed, he observed Giro at work with a black eye. He said that, on that day, Torres came into the restaurant, sat in a booth, ate, and then stayed the entire shift. Giro's

manager at work, Vankley, also recalled that Giro had come into work with a black eye a couple of weeks before her death. She testified that Giro was generally a happy person but got "pissed off" when asked how she got the black eye. *Transcript Vol. 2* at 144. She further testified that Giro told her that she and Torres had gotten into a fight because Giro had found child porn on Torres's computer and smashed it. McHargue, who was the last to see Giro alive, testified that she knew that when she dropped off Giro on October 1 that Giro was "in the process of trying to break up with him and leave him because of the abuse." *Id.* at 85.

[17] Giro's cousin, Hard, testified that she and Giro were very close and talked or saw each other most days, although that became less frequent during the time that Giro was dating Torres. Hard testified that she was concerned about Giro's relationship with Torres, recalling that she saw a bruise on Giro's face about six months after they started dating and, another time, she saw marks on Giro's arm. Hard testified to an occasion about a month before Giro's death, when Giro had called Hard around 2:00 a.m. and asked Hard to pick her up from Torres's home. Hard found Giro walking on the side of the road, about two blocks from Torres's house. According to Hard, Giro was crying hysterically and wearing only a t-shirt and underwear and carrying flip flops. Giro told Hard that she "want[ed] to go home" to her father's house, so Hard took her there, but did not question Giro at that time, thinking Giro would talk about it when she was ready to do so. *Id.* at 175. Hard described that Giro

"changed" after about seven months of dating Torres, becoming more distant and making excuses why she could not spend time with Hard. *Id.* at 177.

[18] Hooper testified that, while she and Torres remained "close" friends, she found him to be jealous and controlling. *Transcript Vol. 3* at 4. Hooper had met Giro a couple of times. She testified that she observed a fight between them, about a month before Giro's death, when Hooper and her boyfriend at the time, and Torres and Giro were all at a park together, and a man came up and spoke to Giro. Torres did not like it and told Hooper that Giro "should have walked away." *Id.* at 6. On another occasion, Hooper said that Torres told her that he "didn't trust" Giro. *Id.* at 7. Hooper testified that, a couple of weeks before Giro's death, Torres told her that Giro had broken his laptop because she found him looking at child porn. He told Hooper that he "didn't want [Giro] around no more," that she "knew too much" and that he "doesn't know what to do and [] has to get rid of her." *Id.* at 12-13.

[19] With regard to picking up her daughter from Torres's house on October 2, Hooper testified that it was 7:00 or 8:00 p.m. and that Torres's car was in the driveway. She did not remember seeing foil or flies in the windows. She recalled asking her daughter, "[W]here's Aimee?" – Hooper said she often would ask that – and the daughter replied that she was sleeping. *Id.* at 34, 52. Hooper was not made aware by her daughter of anything usual having happened at the house that weekend. Hooper acknowledged telling police after the murder that, according to Torres, Giro had found child porn on his computer and that he told Hooper, "I'm going to end up killing this bitch." *Id.*

at 43.  When asked why she continued to take her daughter to his house, Hooper replied that "I don't see him ever hurting her," and "[h]e was a good dad." *Id*. at 46-47.

[20]     Officer Michael Smith, a patrol sergeant with the Lake County Police Department testified that on Sunday October 2, he was working traffic enforcement on the 6:00 a.m. to 6:00 p.m. shift and was parked much of the day at the intersection of 27th Avenue and New Hampshire, facing north, watching for people to run the stop sign.  Officer Smith recalled that on October 2, he saw Torres leave his residence at about 11:00 a.m.  He was walking a small dog and walked to the road and headed south.  Sometime after Giro was found dead in the home on October 5, Officer Smith told his senior officer, Detective Brian Williams, that "I was just over here a couple days ago . . . and saw Jovanni Torres walk out the front door on Sunday [October 2]." *Transcript Vol. 5* at 20.  Officer Smith explained that he was sure of the date as being October 2 because he also made an unrelated arrest there that day.

[21]     After Officer Smith's direct testimony, counsel for Torres sought and received a side bar conference.  He argued to the trial court that Officer Smith's testimony about seeing Torres walk out of his house on October 2 was a "surprise." *Id.* at 16.  The State responded that Officer Smith had been on the witness list since October 2016 and that a report was never provided to the defense because no report was generated.  Thereafter, defense counsel proceeded to cross-examine Officer Smith who explained that "You cannot write a report about every single thing you see," and that at the time that he saw Torres, "I had no idea that this

was even relevant. I wasn't looking for Jovanni Torres. I had no idea anything had even happened in that residence." *Id.* at 21.

[22] After Officer Smith was released as a witness, Torres's counsel moved for a mistrial, arguing that Torres "was never made aware that this witness, Officer Smith, was going to testify to this," noting there had been no reference anywhere in discovery to it. *Id.* at 28. The State responded that "there is no rule that requires us to tell the defense every single thing a witness is going to be testifying to." *Id.* at 29. The State noted that Hooper's testimony about picking up her daughter on October 2 corroborated Officer Smith's testimony and advised that it had another witness who would be testifying to seeing the same thing that Officer Smith saw. The trial court denied Torres's motion for mistrial, noting "You being surprised at this testimony is simply not sufficient to grant your request." *Id.* at 31.

[23] Next, the State presented the testimony of Tina Anderson. Anderson's boyfriend's mother lived near Torres, and Anderson sometimes lived there with her boyfriend and his mother. She did not know Torres personally, but was familiar with him generally, having seen him around the neighborhood. Anderson testified that on Sunday October 2, she was riding as a passenger with her boyfriend in a car and they stopped at the stop sign in front of Torres's home. Anderson said she saw Officer Smith, who she knows, sitting in his police car near the stop sign. Anderson testified that she and her boyfriend saw Torres come out of his house and walk toward a car. She did not recall whether he had a dog with him at the time. When asked how she was sure that it was

October 2, Anderson explained that she knew it was the Sunday right before Giro's body had been found, and she knew it was a Sunday because she and her boyfriend were going down the street to buy beer illegally (due to no Sunday alcohol sales). Anderson recalled that not long after October 5, she ran into Officer Smith, who she knew, and mentioned to him that she had seen him at the stop sign on October 2, noting to him that "it was a shame that there was somebody laying in that house dead when we were both passing it[.]" *Id.* at 43.

[24] Counsel for Torres renewed his motion for a mistrial, arguing that, like Officer Smith, he did not know Anderson was going to testify that she saw Torres on October 2. The trial court denied the motion.

[25] On the fourth day of trial, when the State had two witnesses left, the trial court addressed whether defense intended to call witnesses, determining that "we need to take up the [State's] motion to exclude at this point. The State sees these [witnesses] as, [] based on your opening statement, as alibi witnesses" and "they're moving to exclude them." *Id.* at 109. Counsel for Torres argued that he wanted to call two witnesses, namely Torres's brother, Joel, and mother, Ivette, not to state where Torres was during a period of time, but in order to rebut the testimony of Officer Smith and Anderson, who testified to having seen Torres walk out of his house on October 2. Torres's counsel suggested that he suspected that "there was an attempt on somebody's part . . . to hide these witnesses." *Id.* The State asserted that it was "offensive" to suggest that the State was trying to hide witnesses, "when they have been tendered in discovery, that he's had all this time to depose them[.]" *Id.* at 110.

[26]    The trial court noted its concern that defense had not filed a notice of alibi nor named the two potential witnesses until jury selection. Torres's counsel responded that Joel and Ivette would be rebuttal witnesses, although Ivette "could also place [Torres] someplace other than at that residence during the time periods mentioned" if allowed to so testify. *Id*. at 112. With regard to Ivette, the State indicated, "[I]f she wants to testify . . . about anything other than an alibi . . ., fine," but if she would be testifying that "he was with me and we were at a specific place," then "that is not fair to do . . . to the State[.]" *Id*. at 114.

[27]    After hearing argument, the trial court determined that defense counsel's remarks during opening statements, indicating that Torres was not at the residence, constituted an alibi and that Torres had not shown good cause for failing to timely file an alibi defense. Therefore, it granted the State's motion to exclude the testimony of Joel and Ivette and did not allow Torres to call them for any purpose, alibi or rebuttal.

[28]    Torres's counsel then made an offer of proof that Joel would testify that, contrary to Hooper's testimony, Hooper did not drop off her daughter with Torres on September 30 and pick her up on October 2, and that, instead, Hooper dropped off her daughter with Joel and his girlfriend for the weekend. Joel would also testify that Hooper contacted Joel after she testified at trial and told him that she had lied about this in court. With regard to Ivette, the offer of proof was that she would testify that she had Torres's dog at her house for the

weekend in question, such that Officer Smith could not have seen Torres exit his house walking a dog.  The trial court thereafter observed:

> You know, having all that information, that just tells me that you should have listed them as potential witnesses from the onset of the case, if not during the course of the almost year and a half you've had this case.  Your request is denied.

*Id*. at 118.

[29] The State presented additional witnesses and then rested.  Torres rested without presenting any evidence.  The jury found Torres guilty of murder, and in a second phase, the jury found him guilty of use of a firearm during the commission of murder.  The trial court sentenced Torres to sixty years enhanced by ten years for use of a firearm.  Torres now appeals.

## Discussion & Decision

[30] Torres claims that the trial court abused its discretion when it refused to allow him to call Joel and Ivette to testify.  The trial court has broad discretion in ruling on the admissibility of evidence. *Edwards v. State*, 930 N.E.2d 48, 49 (Ind. Ct. App. 2010), *trans. denied*.  We will reverse such a ruling only when the trial court abuses its discretion. *Id*.  An abuse of discretion occurs when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it.  *Washington v. State*, 840 N.E.2d 873, 879 (Ind. Ct. App. 2006), *trans. denied*.  To reverse, there must be (1) error by the court, (2) that affects the defendant's substantial rights, and (3) the defense must have

made an offer of proof or the evidence must have been clear from the context. *Edwards*, 930 N.E.2d at 50.

[31] On appeal, Torres argues that the trial court did not allow the witnesses to testify "due to defense counsel's failure to file a notice of alibi pursuant to Indiana statute," but that the trial court "was incorrect because the testimony of the witnesses did not constitute an alibi within the legal definition[,]" and instead, the two proposed witnesses "contradicted specific facts in the testimony of the [S]tate's witnesses who claimed to have seen Torres at the residence." *Appellant's Brief* at 9-10. That is, he maintains that he sought to call them, not as alibi witnesses to place him at a location other than the scene of the crime, but as witnesses to rebut the testimony of the State's witnesses who said that they saw Torres at his residence on October 2 and that the trial court should have allowed them to testify. The State, on the other hand, argues that the witnesses' proposed testimony was intended to prove that Torres was not at the house, i.e., he was somewhere else, such that "[t]he witnesses were clearly alibi witnesses." *Appellee's Brief* at 19. The State continues that, because "the defense did not disclose the witnesses through discovery prior to trial as required[] and [] did not give notice of its alibi defense prior to trial," the trial court was correct to grant the State's Motion to Exclude them as alibi witnesses. *Id.*

[32] Alibi has been defined as:

> (1) a defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time;

(2) the fact or state of having been elsewhere when an offense was committed.

*Edwards*, 930 N.E.2d at 50 (quoting Black's Law Dictionary 84 (9th ed. 2009)). Our Supreme Court has observed:

> In criminal law 'alibi' means elsewhere or in another place. It is a mode of defense to a criminal prosecution, where the party accused, in order to prove he could not have committed the crime with which he is charged offers evidence to show that he was in another place at the time the alleged crime was committed.

*Edwards*, 930 N.E.2d at 50 (quoting *Freeman v. State*, 231 N.E.2d 246, 250 (Ind. 1967)). Ind. Code § 35-36-4-1 requires that when a defendant, who is charged with a felony, intends to offer in his defense evidence of an alibi, he must file with the court and serve upon the prosecutor, no later than twenty days prior to the omnibus date, a written statement of his intention to offer such a defense. A defendant who does not timely file the notice of alibi defense may show good cause for not doing so. If the defendant fails to show good cause, the trial court "shall exclude evidence offered by the defendant to establish an alibi. Ind. Code § 35-36-4-3(b); *Washington*, 840 N.E.2d at 879.

[33]    Here, the first mention of the two witnesses appears to have been during jury selection. This timing casts doubt on Torres's claim that the two were rebuttal witnesses because at that point nothing had been presented to rebut. Further, defense counsel's comments during opening statements – that Torres was not at the residence when Giro was dropped off after the bachelorette party and "[h]e

did not come home at any time when [Giro] was missing" – indicated that defense would be pursuing the theory that Torres was somewhere else and therefore could not have been the person who killed Giro. *Transcript Vol. 2* at 30. Given this record, we understand the trial court's decision to exclude alibi testimony from those wtinesses. However, after the trial court granted the State's Motion to Exclude Alibi Witnesses, Torres's counsel presented an offer of proof as to each witness's proposed testimony. According to that offer, Joel's testimony was going to be that Hooper did not drop off her daughter with Torres but, instead, dropped her off with Joel and his girlfriend, the implication being that Hooper did not see Torres on October 2 as she had testified. Ivette's testimony was going to be that Torres's dog was with her all weekend, the implication being that Officer Smith could not have seen Torres walking his dog on October 2 as he had testified. Torres argues that this evidence, to refute the State's witnesses who said they saw him at the house, is not alibi evidence under Indiana law. We agree with him in this regard.

[34]    In *Edwards,* the defendant sought to call witnesses who were at the scene of the crime and would testify that they did not see Edwards there. The State moved to exclude the witnesses on the ground that Edwards had not provided proper notice of an alibi defense. Defense counsel made an offer of proof as to the two witnesses, stating that each would have testified that he or she was at the crime scene and Edwards was not. The trial court granted the State's request to exclude the two witnesses because Edwards had not filed an alibi notice. Ultimately, Edwards was found guilty of felony reckless homicide and

appealed. On appeal, this court held that "evidence of a defendant's absence from a crime scene is not an 'alibi' defense. Rather, it is a rebuttal of the prosecution's contention that the defendant was present and thus capable of committing the crime." 930 N.E.2d at 52. Therefore, the *Edwards* court held that the trial court should not have excluded the witnesses on the ground that they were alibi witnesses. Torres maintains that, as in *Edwards*, Joel and Ivette were going to testify to rebut the State's contention that Torres was present at his home on October 2 and thus capable of committing the crime, and, therefore, the testimony of his two witnesses should not have been excluded as alibi witnesses. We agree and find that the offer of proof shows that Ivette and Joel would have provided rebuttal evidence, and we must decide whether the trial court should have admitted it.

[35] As an initial matter, we do not disagree with the trial court's observation that, given the information that those witnesses had to offer, they should have been disclosed to the State prior to trial as potential witnesses. That being said, we observe that, when the trial court was receiving argument on the State's Motion to Exclude Alibi Witnesses, the prosecutor did not oppose Ivette being called as a witness if her testimony was limited to rebuttal only, stating as follows: "[I]f she wants to testify . . . about anything other than an alibi," then that would be "fine," but if she would be testifying that Torres was with her at a specific place, then "that is not fair to do . . . to the State[.]" *Transcript Vol. 5* at 114. Based on the State's position that limited rebuttal evidence would be "fine," as well as the substance of the offer of proof, we find that Torres should have been permitted

to present the testimony of Ivette and Joel. However, we find that such error was harmless. "An error in the exclusion of evidence is harmless if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights." *Washington*, 840 N.E.2d at 884 (citing *Williams v. State*, 714 N.E.2d 644, 652 (Ind. 1999), *cert. denied*, 528 U.S. 1170 (2000)).

[36] Here, aside from the testimony of Officer Smith, Anderson, and Hooper who each testified to seeing Torres at his house on October 2, the State presented substantial evidence of Torres's guilt. Giro's coworker and manager saw her come to work with a black eye about two weeks before her murder. About a month before Giro's death, Giro called and asked Hard to pick her up at 2:00 a.m.; Hard found Giro about two blocks from Torres's home, walking along the road, crying and hysterical, and wearing only a shirt and underwear. Hooper, who considered Torres to be a close friend, testified that Torres was controlling and jealous. Hooper had witnessed a fight between Giro and Torres about a month before Giro's death, in which Torres was mad that Giro was speaking to another man at a park and told Hooper that he did not trust Giro. He also told Hooper that Giro had discovered child porn on his computer and that she knew too much and he had to get rid of her. Giro had told her manager that she found child porn on Torres's computer and that they fought, resulting in her black eye. When McHargue dropped off Giro at Torres's home in the early morning hours of October 1, she asked Giro if she would be alright because McHargue knew that Torres was known to be abusive.

[37]    When police went to Torres's home in response to the 911 call, Torres and his brother also arrived. Torres, who appeared nervous, stated that he had not been to the house in couple of days, yet he insisted Giro was not there. He said that he too was concerned about Giro's whereabouts and that he had been trying to call her, although phone records showed that Torres's last call to Giro on her phone was a call on September 27. Torres stated that he wanted to find her, but when police asked him for a key to the house, he first said that it was not his house and then he stated that he did not have a key on him.

[38]    Giro was shot and killed by multiple gunshots from a .45 caliber Hi-Point pistol, which Torres owned and which was in the house. During the investigation that followed Giro's death, police saw that one or more walls had been patched to cover bullet holes. Given the wealth of evidence against Torres, even if it was error to have excluded Joel and Ivette as witnesses, any such error was harmless.[3]

---

[3] Torres also claims that the trial court's decision violated his state and federal constitutional rights, arguing that "[t]he decision by the trial court to exclude these witnesses violated Torres'[s] right to compulsory process under the Sixth Amendment to the United States Constitution and violated his right to due process of law under the Fourteenth Amendment to the United States Constitution and Article 1, Section 12 of the Indiana Constitution." *Appellant's Brief* at 15. Torres concedes that he did not raise any constitutional issue to the trial court. He has thus waived his claim. *Washington v. State*, 840 N.E.2d 873, 880 (Ind. Ct. App. 2006) (finding that defendant waived argument that trial court violated his Sixth Amendment rights when it excluded witnesses' alibi testimony because defendant failed to raise that argument to trial court), *trans. denied*. Waiver notwithstanding, any error was harmless because, as discussed above, even if Ivette had testified that Torres's dog was with her for the weekend and if Joel had testified that Hooper dropped off her daughter with him for the weekend, the probable impact on the jury would have been minimal in light of all the other evidence presented.

[39]     Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.